STATE of Wyoming ex rel. Alice
PETERSON, Petitioner,

v.

DISTRICT COURT OF the NINTH
JUDICIAL DISTRICT, State of
Wyoming, Respondent,

v.

MILBANK MUTUAL INSURANCE
COMPANY, a corporation, Real
Party in Interest.

No. 5242.

Supreme Court of Wyoming.

Sept. 8, 1980.

Carol Herman, Wind River Legal Serv-
ices, Inc., and Mike Barton, Director, Wind
River Legal Services, Inc., Fort Washakie,
for petitioner.

James L. Hettinger of Hettinger &
Leedy, Riverton, for respondent.

W. A. Smith and Philip Nicholas of W. A. Smith & Associates, Lander, for Milbank Mut. Ins. Co.

John D. Troughton, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Ronald P. Arnold, Asst. Atty. Gen., Cheyenne, for State of Wyo.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

This petition for a writ of prohibition presents the issue of whether a Wyoming district court has subject–matter jurisdiction to adjudicate a claim arising out of a collision between a pickup truck and a horse on U. S. 287 within the Wind River Indian Reservation, Fremont County, Wyoming. The owners of the horse and truck were both enrolled members of the Shoshone Tribe. The truck owner's subrogee, Milbank Mutual Insurance Company, sued the horse owner, Alice Peterson, who has filed this petition. We hold that the district court is without subject–matter jurisdiction to proceed in this case.

## PROCEDURAL MATTERS

This matter was first before us late last year when Peterson appealed the district court's denial of her motion to dismiss for lack of subject–matter jurisdiction and lack of personal jurisdiction. In an unpublished order, we dismissed the appeal on our own motion on December 14, 1979, because the denial of Peterson's motion by the district court was not a final order pursuant to Rule 1.05, W.R.A.P., from which an appeal may be taken. *Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945); and *In re Greybull Valley Irrigation District,* 52 Wyo. 168, 71 P.2d 801 (1937).

Currently, petitioner Peterson asks us to invoke our original jurisdiction under Article 5, Section 3, of the Wyoming Constitution and enter a writ of prohibition.

The exercise of our original jurisdiction is discretionary. E. g., *State ex rel. Pearson v. Hansen,* Wyo., 409 P.2d 769, 770 (1966). However, the writ is most appropriately granted when the inferior court lacks subject–matter jurisdiction. *State ex rel. Bank of Chadron v. District Court of Weston County,* 5 Wyo. 227, 39 P. 749, 751 (1895). The writ of prohibition is also particularly appropriate where the wrongful exercise of jurisdiction is contrary to the law of the land. *Id.* and *State ex rel. Mau v. Ausherman,* 11 Wyo. 410, 72 P. 200, 204 (1903). The writ of prohibition is ordinarily granted only where there is no adequate remedy at law, yet we granted the writ in *State v. District Court,* Wyo., 399 P.2d 583, 584 (1965) to protect petitioners from an improper jury trial and subsequent appeal. In the case at bar, a writ of prohibition is, indeed, appropriate to prevent the district court from exercising subject–matter jurisdiction forbidden to it by federal law and to prevent the petitioner from having to defend this action in the state court system, as well as in the tribal court system.

In response to the Petition for a Writ of Prohibition, we issued an Order to Show Cause on January 3, 1980, therein noting that the State of Wyoming likely had an interest in the case, and, therefore, we included the Attorney General in the Show–Cause Order. The Attorney General, Milbank Mutual, and the District Court have all submitted briefs supporting the District Court's position that it has jurisdiction in the premises.

## THE FACTS

The jurisdictional facts are all stipulated. The horse owner, Alice Peterson, and the pickup truck owner and driver, Ross Duane Cady, are both enrolled members of the Shoshone Tribe of Indians of the Wind River Indian Reservation, and both reside within the reservation.[1] Cady insured his truck

---

1. Apparently Mr. Cady is only one-half Indian by blood and Ms. Peterson is less than one quarter Indian by blood. However, both are Indians for legal purposes. E. g., see the definition of Indians in 25 C.F.R. 11.2(c) or 25 U.S. C.S. § 479. Although Milbank Mutual emphasizes the non Indian blood of Cady and Peterson, it does not dispute that Cady and Peterson

with Milbank Mutual through the latter's Lander office, which is not within the reservation.[2] In 1977, the truck was damaged and the horse killed when the two collided in the vicinity of Mile Post 83.8 of U. S. Highway 26 and 287. The accident site is a point on the highway within the boundaries of the Wind River Indian Reservation and also within Ms. Peterson's Allotment # 871. Wyoming currently holds a right-of-way permit issued by the Bureau of Indian Affairs in 1938, to build and maintain U. S. Highway 26 and 287 across Allotment # 871.

There exists at Fort Washakie the Wind River Court of Indian Offenses, operated by the Bureau of Indian Affairs. The court is a court of general criminal and civil jurisdiction for the Shoshone and Arapahoe Tribes of the Wind River Indian Reservation and has jurisdiction to adjudicate the case at bar. It is stipulated that the judges of the Indian court have had legal training but are not lawyers or members of any bar association.

## A PRELIMINARY ISSUE—MILBANK'S RIGHTS AS A SUBROGEE

All parties agree that Milbank Mutual is the real party in interest.[3] The parties

opposed to the writ of prohibition would prefer to characterize the dispute as one between Peterson, an Indian, and Milbank, a non–Indian, whereas petitioner urges that the case be viewed as one between Indians. The State would concede that if the case is viewed as one between Indians, then the district court lacks jurisdiction. But the State argues that a subrogation can alter the jurisdictional nature of a case and confer a jurisdictional option that was lacking absent the subrogation. In support of this argument, the State cites *Lumbermen's Mutual Casualty Co. v. Elbert*, 348 U.S. 48, 75 S.Ct. 151, 99 L.Ed. 59 (1954). Although that case involved consideration of Louisiana's direct–action statute allowing a tort plaintiff to sue the alleged tortfeasor's insurer, the Supreme Court held that diversity jurisdiction existed where there was diversity between the plaintiff and the insurer, even if no diversity existed between the plaintiff and the alleged tortfeasor. Thus, by analogy to federal diversity jurisdiction, it would appear that the instant case is formally between a non–Indian and an Indian. Nonetheless, we consider it significant that trial of this case under Wyoming law[4] (e. g., our comparative–negligence

---

are Indians for all purposes with which we are here concerned.

**2.** According to the insurance company's brief, Cady's non Indian wife purchased an insurance policy which was later amended to cover the pickup truck which also, according to the insurance company's brief, is jointly owned.

The brief of the insurance company also states that a trailer being towed by the pickup was destroyed in the accident and that the trailer is solely owned by Mrs. Cady.

Paragraph No. 2 of Peterson's Petition for Writ of Prohibition refers to only Mr. Cady as the subrogor and refers to the pickup as belonging to Mr. Cady. In answering the Petition for Writ of Prohibition, both the insurance company and the district court admit the allegations of Peterson's Paragraph No. 2. In addition, a stipulation filed in the district court between Peterson's attorney and Milbank Mutual's attorney refers only to Mr. Cady as the insured.

In view of the stipulation and the answers to the petition for writ of prohibition, we consider that the subrogee insurance company is only claiming rights acquired through Mr. Cady, an Indian, and not through Mrs. Cady, a non Indian.

**3.** We wonder if the insurance policy might contain a collision deductible provision, in which case Mr. Cady would not have been completely reimbursed for his loss by Milbank Mutual. If Mr. Cady wished to seek recovery for his unreimbursed loss, we are not at all sure that the Wyoming cases cited below, which concern the definition of the real party in interest in insurance cases, clearly establish that Mutual Milbank is the real party in interest. See *Wyoming Farm Bureau Mutual Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 10 Cir., 467 F.2d 990 (1972); *Gardner v. Walker*, Wyo., 373 P.2d 598 (1962); and *Iowa Nat. Mut. Ins. Co. v. Huntley*, 78 Wyo. 380, 328 P.2d 569 (1958).

However, this issue does not affect the outcome of the case and since we lack all the relevant facts we see no reason not to accept the litigants' characterization of Mutual Milbank as the real party in interest.

**4.** We are aware, of course, that in the absence of a federal or tribal adoption of Wyoming law the tribal court will not be under any compunction to apply substantive Wyoming law if this case is presented to the tribal court.

statute, § 1–1–109, W.S.1977) would, of necessity, involve evaluation of the conduct (for purposes of ascertaining negligence) of two Reservation Indians on the Reservation.

## TRIBAL COURT JURISDICTION

The Code of Federal Regulations confers certain jurisdiction upon the Wind River Court of Indian Offenses. 25 C.F.R. § 11.-1(a) states:

"(a) Except as otherwise provided in this part, § 11.1–11.87H apply to the following Indian reservations:

\*　　\*　　\*　　\*　　\*　　\*

"(v) Wind River (Wyoming)."

25 C.F.R. § 11.22, under the heading "CIVIL ACTIONS (Jurisdiction)," provides:

"The Court of Indian Offenses shall have jurisdiction of all suits wherein the defendant is a member of the tribe or tribes within their jurisdiction, and of all other suits between members and nonmembers which are brought before the courts by stipulation of both parties...."

The portion of the regulations dealing with civil jurisdiction does not specify that the cause of action must arise on a reservation or in "Indian country." However, even if, arguendo, we imply this condition, the condition is satisfied. The term "Indian country" is defined by 18 U.S.C.S. § 1151:

"Except as otherwise provided in sections 1154 and 1156 of this title [18 USCS §§ 1154 and 1156], the term 'Indian country', as used in this chapter [18 USCS §§ 1151 et seq.], means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights–of–way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been ex-

tinguished, including rights–of–way running through the same."

The United States Supreme Court has made the following comment on this definition:

"... While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction. ..." *DeCoteau v. District County Court for the Tenth Judicial District*, 420 U.S. 425, 427, fn. 2, 95 S.Ct. 1082, 1084, fn. 2, 43 L.Ed.2d 300, reh. den. 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975).

See, also, *Mattz v. Arnett*, 412 U.S. 481, 504, 93 S.Ct. 2245, 2257, 37 L.Ed.2d 92 (1973).

A dissent to this opinion seeks to avoid the literal language of 18 U.S.C. § 1151, which defines Indian country to include rights–of–way through Indian country. The dissent argues that the state highway traversing the Wind River Indian Reservation in this case is not Indian country. In *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), the Supreme Court made it quite clear that 18 U.S.C. § 1151 means what it says. In that case, an Indian was convicted in state court of attempted burglary. He sought habeas–corpus relief on the grounds that the alleged crime had occurred in Indian country, that he was an enrolled unemancipated member of the Colville Indian Tribe and that, therefore, the United States had exclusive jurisdiction. A major issue in the United States Supreme Court was the definition of Indian country. As the Supreme Court viewed the facts, the site of the alleged crime was: (1) a plot of land held under a patent in fee by a non–Indian, (2) which lay within a governmental townsite, a plot of which was filed for record in the county courthouse, apparently with the usual dedication to the public interest, (3) which lay within an Indian Reservation. The Supreme Court rejected the dual contentions that sale of the land to a non–Indian in fee or dedication of the town to the public interest removed the

land from the status of "Indian country." The Court said:

> " ... [A]n impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid." Id., 368 U.S. at 358, 82 S.Ct. at 428.

The dissent's "highway exception" to the definition of Indian country is also undercut by another United States Supreme Court case involving Colville Indians. *Washington v. Confederated Tribes of Colville,* —— U.S. ——, 100 S.Ct. 2069, 2086, 65 L.Ed.2d 10 (1980). That is an Indian tax case, but it is worth discussing in the context of the definition of Indian country. The United States Supreme Court held that the State of Washington could not impose a tax on the motor vehicles of reservation Indians, even though the state had argued that the tax was for the use of highways within the state. In dictum, the Supreme Court speculated that the state might be able to impose a tax "on the use outside the reservation of Indian–owned vehicles ...." Id. The case does not tell us whether state highways traverse Indian reservations in that state. However, we take judicial notice of road atlases which show that in Washington, as well as in Wyoming and other states, state and/or federal highways traverse Indian Reservations. The Supreme Court's statement indicating that at most the Reservation Indians could be taxed for the use of off–reservation highways is additional rebuttal of the dissent's argument that state highways within a reservation have been severed from the reservation.

The above regulations, statute, and case law make it clear that the Wind River Court of Indian Offenses has jurisdiction to hear the negligence action at bar; however, the regulations do not state whether the jurisdiction conferred upon the tribal court is meant to be exclusive or merely concurrent with state or federal court jurisdiction.

## JURISDICTION OF THE DISTRICT COURT

Petitioner challenges both the district court's subject–matter jurisdiction of the cause of action and its assertion of in personam jurisdiction over herself. Because we conclude that the district court lacked subject–matter jurisdiction, we need not consider the issue of personal jurisdiction. The main concern of each of the five briefs filed in this case is the district court's subject–matter jurisdiction. (Petitioner has filed a brief and a reply brief; Milbank, the attorney general, and the district court have each filed one brief.) It would be unnecessarily tedious to cite the contentions of each of the four parties on the issue of subject–matter jurisdiction. A few introductory remarks, which we will justify in detail below, are appropriate.

■ The essential issue is whether the federal government has preempted the state jurisdiction which would ordinarily exist in this sort of case and replaced it with an exclusive tribal–court jurisdiction. Because we conclude that the federal government has, in fact, preempted state jurisdiction with respect to this cause of action, we consider it irrelevant to debate the wisdom of that preemption or the competence of the tribal court, issues raised by the district court and Milbank. We will treat separately the issue of whether our conclusion is objectionable under the federal or Wyoming constitutions. Because we construe the subject–matter jurisdiction issue as a question of federal law, we must, therefore, rely for guidance on United States Supreme Court opinions. Generally, we interpret these cases to mean that Wyoming is possessed of certain jurisdictional rights and prerogatives with respect to the Wind River Indian Reservation, but that the State's jurisdiction does not exist in circumstances where it would interfere with tribal self–government.

Whether or not State action will or will not "interfere with tribal self–government" is the fulcrum about which the United States Supreme Court is, these days, decid-

ing the kind of cases with which we find ourselves concerned in this litigation. In discussing the relevant Supreme Court case law, our focus will, thus, be on the issue of whether the district court's exercise of jurisdiction in the case at bar would interfere with tribal self–government.

## THE SUPREME COURT CASE LAW

*Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), is an appropriate place to begin our inquiry. *Williams* summarizes some relevant prior case law and is in turn commented upon frequently in subsequent cases. *Williams* is similar in many respects to the case at hand. Unless a controlling distinction between *Williams* and the instant matter were found to exist, it must be concluded that *Williams* is controlling for the proposition that the Wind River Court of Indian Offenses has exclusive jurisdiction of the matter to which we here address our concern.

In *Williams*, a non–Indian, operating a general store on a Navajo reservation in Arizona under federal license, brought suit in state court to collect for goods sold an Indian couple on credit. The Indian defendants moved unsuccessfully to dismiss the state court suit for lack of jurisdiction. The Indians maintained that exclusive jurisdiction lay in the tribal court and on appeal the United States Supreme Court upheld this contention.

After citing earlier case law, the *Williams* Court said:

"... Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. Cf. *Utah & Northern Railway v. Fisher*, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542." 358 U.S. at 220, 79 S.Ct. at 271.

The last above–cited case from *Williams* is, indeed, ancient (1885), but it illustrates a still valid instance of state jurisdiction on an Indian reservation, even absent federal delegation or permission to the state. *Utah & Northern Railway Co.*, supra, concerned a dispute between Idaho Territory tax authorities and a railroad which ran through an Indian reservation; the issue was whether the track passing through the reservation was subject to state tax. The Indians sold land for the line to the United States, which then conveyed the land to the railroad. The Supreme Court said that by force of the cession thus made, the railroad land was withdrawn from the reservation. 6 S.Ct. at 247. Citing the railroad's argument that the reservation is excluded from the general jurisdiction of the Territory of Idaho, the Court said:

"'To uphold that jurisdiction in all cases and to the fullest extent would undoubtedly interfere with the enforcement of the treaty stipulations, and might thus defeat provisions designed for the security of the Indians. But it is not necessary to insist upon such general jurisdiction for the Indians to enjoy the full benefit of the stipulations for their protection. The authority of the territory may rightfully extend to all matters not interfering with that protection. ...'" 6 S.Ct. at 247–248.

Notwithstanding this reference to an exception providing for state jurisdiction, the *Williams* Court continued:

"Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation. To assure adequate government of the Indian tribes it enacted comprehensive statutes in 1834 regulating trade with Indians and organizing a Department of Indian Affairs. 4 Stat. 729, 735. Not satisfied solely with centralized government of Indians, it encouraged tribal governments and courts to become stronger and more highly organized. See, e. g, the Wheeler–Howard Act, §§ 16, 17, 48 Stat. 987, 988, 25 U.S.C. §§ 476, 477. Congress has followed a policy calculated eventually to make all Indians full–fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the

Indians permits the change without disadvantage to them. See H.R.Rep. No. 848, 83d Cong., 1st Sess. 3, 6, 7 (1953). Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which *Worcester v. Georgia* [6 Pet. 515, 8 L.Ed. 483] had denied." 358 U.S. at 220–221, 79 S.Ct. at 271.

The *Williams* Court then discussed the 1868 treaty between the Navajos and the United States, 15 Stat. 667 (1868), and noted that the treaty promise of a reservation included the promise that no one except United States Government personnel (and the Navajos) were to enter the reserved area. 358 U.S. at 221, 79 S.Ct. at 271. The Court said:

"... Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in *Worcester v. Georgia*, 6 Pet. 515, [8 L.Ed. 483] was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed. ..." Id. at 221–222, 79 S.Ct. at 271.

The Wind River Indian Reservation was established pursuant to a treaty between the United States and the Eastern Band of Shoshonee Indians and the Bannack Tribe of Indians. 15 Stat. 673 (1868). This treaty, which is found in the United States Statutes at Large, back to back with the Navajo treaty, considered by the Supreme Court in *Williams,* contains a reservation promise virtually identical to the one in the Navajo treaty, which restricts access to the reservation to Indians and United States employees. The "implicit" understanding found by the *Williams* Court in the Navajo treaty must, therefore, be found in the treaty which established the Wind River Indian Reservation if we are to pay the *Williams* opinion its due.

The *Williams* Court also said that although Congress may deny the states the power to regulate Indian affairs, Congress may also delegate that power to the states in order to further Congressional goals. *Williams,* supra, at 358 U.S. 220–221, 79 S.Ct. at 270–271. Examples of such delegations are discussed at 358 U.S. 221–223, 79 S.Ct. at 270–272. At 358 U.S. 222–223 and 222, fn. 10, 79 S.Ct. at 271–273 and 271, fn. 10, the Court expressly referred to the Act of August 15, 1953, c. 505, §§ 6, 7, 67 Stat. 590 [5], in which "Congress did express its willingness to have any State assume jurisdiction over reservation Indians if the State Legislature or the people vote affirmatively to accept such responsibility." Sections 6 and 7 are reproduced in footnote 4, supra. These sections imposed upon the states certain requirements to establish state jurisdiction on the reservation. Article 21, Section 26, of our Constitution provides, inter alia, that "said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; ..." [6] This

---

**5.** These sections provide:

"Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided*, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

"Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

"Approved August 15, 1953."

**6.** Article 21, Section 26, Constitution of Wyoming, provides:

"*Sec. 26. Ownership of certain lands disclaimed; restriction on taxation of nonresidents.*–The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute juris-

constitutional provision was not changed and we are aware of no Wyoming legislation to accept this Congressional offer of delegation. In 1968, Congress very substantially altered its offer to the states by repealing § 7, supra, in Section 403(b) of Public Law 90–284, Title IV, April 11, 1968, 82 Stat. 79.

The *Williams* Court also addressed the fact that the store owner seeking to collect his debt was a non–Indian:

"... It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there ... The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. ..." 358 U.S. at 223, 79 S.Ct. at 272.

Thus, after discussing the traditional independence of reservation Indians from state intrusion into tribal affairs, the treaty guarantees of the Navajos, the Congressional efforts to establish tribal courts on reservations and the failure of Arizona to accept a Congressional offer of delegated federal jurisdiction, the *Williams* Court concluded that concurrent state jurisdiction in the *Williams* case was impermissible.

We now turn our attention to later decisions which give flesh to the *Williams* skeleton.

Three years later, after *Williams*, in *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), the Court was presented with a question of whether the State of Alaska could exercise jurisdiction over off–reservation Indian fishing activity. The Court examined the Alaska Statehood Act, 72 Stat. 339 (1958). Section 4 of that act provides that Indian "property (including fishing rights)" shall "be and remain under the absolute jurisdiction and control of the United States." The litigants had proceeded on the assumption that if the Indians had such fishing rights within the meaning of the above language, then the State of Alaska was without power to apply its laws to regulate those rights. The *Kake* Court rejected this reasoning, 369 U.S. at 67, 82 S.Ct. at 567, and, in so doing, noted that the language about "absolute jurisdiction and control" of the United States is an adoption of "the formula of nine prior statehood Acts" (including Wyoming's, 26 Stat. 222). 369 U.S. at 67, 82 S.Ct. at 567. Referring back to *Williams*, the *Kake* Court observed that Indian lands in Arizona remain under the absolute jurisdiction and control of the United States, "yet in *Williams v. Lee* [supra], we declared that the test of whether a state law could be applied on Indian reservations there was whether the application of that law would interfere with reservation self–government." Id. at 67–68, 82 S.Ct. at 567. The Court then cited past case law allowing the exercise of state jurisdiction within a reservation: *Utah & Northern Railway*, supra; *Langford v. Monteith*, 102 U.S. 145, 26 L.Ed. 53 (1880)–process may be served within a reservation for a suit in territorial court between two non–Indians; *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1881) and *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896)– murder of one non–Indian by another on a reservation is a matter of state law; *Mari-*

diction and control of the congress of the United States; that the lands belonging to the citizens of the United States residing without this state shall never be taxed at a higher rate than the lands belonging to residents of this state; that no taxes shall be imposed by this state on lands or property therein, belonging to, or which may hereafter be purchased by the United States, or reserved for its use. But nothing in this article shall preclude this state from taxing as other lands are taxed, any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person, a title thereto, by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any acts of congress containing a provision exempting the lands thus granted from taxation, which last mentioned lands shall be exempt from taxation so long, and to such an extent, as is, or may be provided in the act of congress granting the same."

*copa & Phoenix Railroad Co. v. Arizona Territory*, 156 U.S. 347, 15 S.Ct. 391, 39 L.Ed. 447 (1895)–a railway right–of–way through a reservation could be taxed since it had been withdrawn from the reservation; and *Thomas v. Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898)–Oklahoma territorial tax on the cattle of non–Indian lessees of reservation land upheld.[7] The Court also cited *New York ex rel. Ray v. Martin*, 326 U.S. 496, 499, 66 S.Ct. 307, 308, 90 L.Ed. 261 (1946), for the proposition that "in the absence of a limiting treaty obligation or Congressional enactment, each state has a right to exercise jurisdiction over Indian reservations within its boundaries." (This quotation is particularly appropriate to the *Kake* case–as opposed to the *Williams* case or the case at bar–because *Kake* involved off–reservation fishing rights unprotected by federal law.) The *Kake* Court referred to *Williams* as its latest decision and characterized it as a

> "civil action brought by a non–Indian against an Indian for the price of goods sold the latter on the Navajo Reservation. The applicability of state law, we there said, depends upon 'whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them, . . .'" *Kake*, supra, 369 U.S. at 74–75, 82 S.Ct. at 570.

The *Kake* Court then concluded that regulation of off–reservation fishing rights would not impair reservation self–government.

The United States Supreme Court had occasion to revisit *Williams* in 1971. *Kennerly v. District Court of Montana*, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971). The per curiam opinion, with a two–justice

dissent, split over the issue of "'whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.'" *Kennerly*, 400 U.S. at 427, 91 S.Ct. at 482, citing *Williams*, supra, 358 U.S. at 220, 79 S.Ct. at 270.

The Kennerly petitioners to the United States Supreme Court were members of the Blackfeet Indian Tribe, residing on the Blackfeet Indian Reservation in Montana. They had bought food on credit from a grocery store located within the town limits of Browning, a town incorporated under the laws of Montana but located within the boundaries of the Blackfeet Reservation. We are not told whether the grocer was also Indian. At any rate, the grocer commenced suit in the Montana state courts to collect the debts. The petitioners unsuccessfully moved the lower court to dismiss the suit on the grounds that they were Indians and the transactions took place on an Indian reservation. The Montana Supreme Court accepted jurisdiction of the jurisdictional dispute on a "writ of supervisory control" and, in so doing, affirmed and distinguished *Williams*, supra. The United States Supreme Court found the distinction unconvincing and vacated the judgment of the Montana Supreme Court. Although the attempted distinction in *Kennerly* is not on all fours with the case at bar, it is worthwhile to consider the Kennerly opinion in detail since it illustrates how stringently the United States Supreme Court protects reservation Indians from the exercise of state court jurisdiction when the cause of action arises on a reservation and involves Indian defendants.

---

7. In this vein, Milbank, the State and/or the District Court also cite: *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)–state can require Indian retailer on the reservation to add the tax on cigarettes to the sale price with respect to sales to non Indians; *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) dicta stating that the federal prohibition against taking intoxicants into an Indian colony within a state does not deprive the state of its sovereignty over the area, since the federal government, by such prohibition does not as-

sert exclusive jurisdiction within the colony; *Surplus Trading Co. v. Cook*, 281 U.S. 647, 651, 50 S.Ct. 455, 74 L.Ed. 1091 (1930)–dicta that state laws, civil and criminal, apply within an Indian reservation, except that the laws can only have restricted application to the "Indian wards,"; *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Cherokee Nation v. State of Georgia*, 30 U.S. 1 (5 Pet. 1) 8 L.Ed. 25 (1831); and *Worcester v. State of Georgia*, 31 U.S. 515 (6 Pet. 515) 8 L.Ed. 483 (1832), are interpreted to provide for a rather diminished concept of Indian sovereignty.

As mentioned in the discussion of *Williams*, supra, in 1968 Congress altered its 1953 offer to the states to assume jurisdiction of Indian affairs under certain conditions. 25 U.S.C.S. § 1322 (April 11, 1968, P.L. 90–284, Title IV, § 402, 82 Stat. 79) now provides:

"(a) *Consent of United States–Force and effect of civil laws.* The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

"(b) *Alienation, encumbrance, taxation, use, and probate of property.* Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) *Force and effect of tribal ordinances or customs.* Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.",

and is qualified by 25 U.S.C.S. § 1326 (§ 406, 82 Stat. 80):

"*Special election*

"State jurisdiction acquired pursuant to this title [25 USCS §§ 1321–1326] with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults."

In *Kennerly*, there was some effort by both Montana and the Blackfeet to provide for state jurisdiction concurrent with the jurisdiction of the Tribal Court. In 1963, Montana, in response to the 1953 offer, extended criminal but not civil jurisdiction over an Indian reservation in the state different than the Blackfeet Reservation. In 1967, the Blackfeet Tribal Council legislated that " 'The Tribal Court and the State shall have concurrent and not exclusive jurisdiction of all suits wherein the defendant is a member of the Tribe which is brought before the Courts. . . .' " 400 U.S. at 425, 91 S.Ct. at 481.

The Montana Supreme Court construed the action of the Blackfeet Tribal Council as sufficient to establish concurrent state jurisdiction. The United States Supreme Court disagreed and held that the absence of affirmative legislative action on the part of Montana prevented Montana from asserting jurisdiction in the Blackfeet Reservation under the 1953 Act and the absence

**1066**

of a general election within the Blackfeet Reservation prevented Montana from asserting jurisdiction under the 1968 Act.

The *Kennerly* dissent argued that the ruling of the Montana Supreme Court did not infringe the right of the Indians to make their own laws since the Indians themselves had legislated that the Montana state courts would share concurrent jurisdiction. Whatever the relative merits of the *Kennerly* dissenting and majority opinions, we view the *Kennerly* majority as emphasizing a very vivid federal policy mandating the exclusive jurisdiction of tribal courts in cases involving internal tribal affairs or tribal self-government unless there has been an express delegation by Congress allowing the state to assume jurisdiction. None of the parties to this lawsuit contend that the State and the Wind River Indian Reservation Indians have arranged for state jurisdiction in the manner provided by the Congress.

Furthermore, *Kennerly* rebuts any sort of argument that might be made to the effect that in using the highway Ms. Peterson impliedly consents to state jurisdiction. (The highway was fenced and Ms. Peterson is accused of leaving a gate in the fence open; presumably the gate is for her convenience in using the highway.) *Kennerly* makes clear that consent by Indians to state jurisdiction—if the state does not already possess jurisdiction—must be given according to Congressional procedures.

A little more than a decade after *Williams*, the Arizona courts were again reversed by the United States Supreme Court. *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Arizona insisted, and the Arizona courts agreed (relying on *Kake*, supra), that the state could tax the income of an Indian earned on the reservation. In reversing, a unanimous Court reviewed Supreme Court decisions on state jurisdiction within an Indian reservation. The Court discussed the concept of tribal sovereignty and concluded that the state tax was impermissible. The Court said:

> "Finally, the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption. [Footnote and citation omitted.] The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power. [Citations and footnote omitted.]

> "The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read. . . ." 411 U.S. at 172, 93 S.Ct. at 1262.[8]

The *McClanahan* Court then proceeded to examine the relevant treaty and statutes.

---

**8.** A recent discussion of Indian sovereignty by the United States Supreme Court is also found in *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978), where the court said:

> ". . . The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. . . ."

If, by sovereignty, the Supreme Court means the power of a sovereign to make rules governing its citizens, it appears that the United States Supreme Court is retaining concepts of Indian sovereignty vis-a-vis the state's when it guards against state intrusion, the rights of "reservation Indians to make their own laws and be ruled by them." *Kake*, supra, at 369 U.S. 75, 82 S.Ct. at 570. With respect to Indian peoples, the perception of this power of a sovereign to make rules governing its citizens has become complex because the power has traditionally been limited not only territorially but also by classification as to people and activities within the territory. The situation is also complex because the federal sovereign has shared its power with the Indians either by treaty or delegation and with some states by delegation.

However, as between the United States and Wyoming, it is clear that within the Wind River Indian Reservation the sovereign power is vested in the United States. The Reservation must be regarded as being within the "special maritime and territorial jurisdiction of the United States," in accordance with 18 U.S.C. § 7, and because of the language of Article 21, § 26, of the Wyoming Constitution, supra, the Reservation must be regarded as under the exclusive jurisdiction of the United States.

We have already discussed the Navajo treaty of 1868, along with the 1868 treaty establishing the Wind River Indian Reservation; both limit reservation access to Indians and federal employees. The Court recognized that that portion of the Navajo treaty did not explicitly state that the "Navajos were to be free from state law or exempt from state taxes." 411 U.S. at 174, 93 S.Ct. at 1263. Nonetheless, the Court concluded that the Navajo treaty precludes "extension of state law–including state tax law–to Indians on the Navajo Reservation." Id. at 175, 93 S.Ct. at 1264.

The *McClanahan* Court continued:

"Moreover, since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation. [Footnote omitted.] Thus, when Arizona entered the Union, its entry was expressly conditioned on the promise that the State would 'forever disclaim all right and title to ... all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.' Arizona Enabling Act, 36 Stat. 569." Id. at 175, 93 S.Ct. at 1264.

The language quoted from the Arizona Enabling Act by the *McClanahan* Court is virtually identical to that found in Article 21, Section 26, of the Wyoming Constitution, reproduced in fn. 6, supra. The Wyoming Act of Admission, 26 Stat. 222–226 (1890), does not repeat the relevant language from Article 21, Section 26, of the Wyoming Constitution. However, because the Act of Admission recites acceptance, ratification and affirmance of the Wyoming Constitution, we held in a previous case that the "provisions of the act of admission had the same effect ... as an independent

act of Congress enacting the provisions of our constitution ...." *Merrill v. Bishop*, 74 Wyo. 298, 311, 287 P.2d 620, 624 (1955). *McClanahan* thus suggests that interpretation of Article 21, Section 26, of the Wyoming Constitution is largely a question of federal law. *McClanahan* also broadly affirms the principles of *Williams* and *Kennerly*, supra.

The Court again discussed the current offer of Congress to delegate general jurisdiction over Indian reservations (conditioned upon Indian consent) to the states. The Court said:

"... But we cannot believe that Congress would have required the consent of the Indians affected and the amendment of those state constitutions which prohibit the assumption of jurisdiction if the States were free to accomplish the same goal unilaterally by simple legislative enactment. See *Kennerly v. District Court* [supra]." 411 U.S. at 178, 93 S.Ct. at 1265.

We interpret this language as indicating that the limited state jurisdiction over Indians discussed in *Kake*, supra, is to be narrowly defined. Moreover, *Kake* dealt with state jurisdiction off the reservation, whereas *McClanahan, Williams,* and *Kennerly*, supra, show that specific treaty provisions may limit a state's limited jurisdiction on a reservation.

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), is a companion case of *McClanahan* and dealt with state taxation with respect to off–reservation activities. Although the resolution of two tax issues in *Mescalero* is not relevant to our case, the following language is helpful:

"At the outset, we reject–as did the state court–the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes ... The conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester v. Georgia*, 6 Pet. 515, 556–561 [8 L.Ed. 483] (1832), has given way to more individualized treatment of particular treaties and specific federal statutes, including state-

hood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government. . . ." 411 U.S. at 147–148, 93 S.Ct. at 1270.

We have previously discussed the treaty which established the Wind River Indian Reservation and the federal and state law concerning Wyoming's admission to the Union; *Mescalero Apache Tribe* further emphasizes the importance of that history.[9]

*Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106, reh. den. 425 U.S. 926, 96 S.Ct. 1524, 47 L.Ed.2d 772 (1976), is a case which we consider very important in interpreting the *Williams* test of whether state jurisdiction would interfere with tribal government. *Fisher* involved the issue of whether the state of Montana had jurisdiction to resolve a child–custody dispute between reservation Indians and the Court held that exclusive jurisdiction lay with the Tribal Court.

Unlike the case at bar, *Fisher* did not involve any non–Indian parties. However, the *Fisher* Court indicated that it was applying the *Williams* test of whether the state jurisdiction would interfere with tribal self–government, and in so indicating the Court observed that *Williams* involved a non–Indian party. *Fisher*, supra, 424 U.S. at 386, 96 S.Ct. at 946. The Court said:

"State–court jurisdiction plainly would interfere with the powers of self–government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves. . . ." 424 U.S. at 387–388, 96 S.Ct. at 947.

The *Fisher* Court referred to § 16 of the Indian Reorganization Act, 48 Stat. 987, 25 U.S.C. § 476, which authorizes tribal courts, as "a statute specifically intended to encourage Indian tribes to revitalize their self–government." Id. at 387, 96 S.Ct. at 946. Again referring to the Indian Reorganization Act, the Court said:

" . . . [I]t implements an overriding federal policy which is clearly adequate to defeat state jurisdiction over litigation involving reservation Indians. Accordingly, even if we assume that the Montana courts properly exercised adoption jurisdiction prior to the organization of the Tribe, a question we do not decide, the jurisdiction has now been pre–empted." Id. at 390, 96 S.Ct. at 948.

The *Fisher* Court went on to observe that Montana had not accepted jurisdiction over Indian affairs pursuant to either of the two Congressional offers discussed above.

We view *Fisher* as indicating that where a tribal court is established to handle a dispute involving reservation Indians, concurrent state jurisdiction is an interference with tribal self–government. *Fisher* is applicable to the case at bar because, as discussed in the section of this opinion titled, "A PRELIMINARY ISSUE—MILBANK'S RIGHTS AS A SUBROGEE," trial of the case in a Wyoming court would necessarily involve evaluation of the conduct of two Indians arising out of activities taking place on the reservation.

In *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Court held that an Indian tribal court lacks jurisdiction to try a non–Indian defendant for a crime committed on the reservation. In explaining its decision, the Court relied, inter alia, on the plight of the non–Indian criminal defendant in a strange court system. Id. at 435 U.S. 210–211, 98 S.Ct. at 1021–1022.[10] We are urged to con-

---

**9.** During the drafting of this opinion, the United States Supreme Court decided the consolidated cases of *State of Washington v. Confederated Tribes of the Colville Indian Reservation and State of Washington v. United States*, ··· U.S. ··, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). This opinion is consistent with earlier Supreme Court cases on state Indian taxing conflicts.

E. g., *Moe v. Confederated Salish and Lootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); and *McClanahan*, supra.

**10.** Milbank also cites us language from *Ex Parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), describing the unfairness of trying an Indian for murder in a strange court system.

sider the plight of the non–Indian plaintiff in the instant case and to ignore the distinction between a criminal and a civil action. However, in the case at bar, a federal regulation, supra, provides for tribal court jurisdiction when the defendant in a civil action is an Indian; in *Oliphant* there was no federal law providing for tribal court jurisdiction over the non–Indian criminal defendant.

In *Washington v. Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), reh. den. 440 U.S. 940, 99 S.Ct. 1290, 59 L.Ed.2d 500, the Court upheld the State of Washington's assertion of partial jurisdiction over Indian reservations and affairs. Washington had legislated, pursuant to 67 Stat. 588–590, supra, that it would assert jurisdiction with respect to certain Indian matters but not with respect to others. The district court correctly points out that in this case the federal supreme court held that Washington's partial assertion of jurisdiction was lawful even though Washington had not amended its constitution which contains a disclaimer of authority over Indian country. Nonetheless, Washington did clearly take advantage of 67 Stat. 588–590 by legislative action and Wyoming has not.

■ We are persuaded by the above review of United States Supreme Court cases that exclusive jurisdiction of the case at bar lies with the Wind River Court of Indian Offenses. In reaching this conclusion, we have also reviewed two state supreme court decisions cited by the district court. In *Vermillion v. Spotted Elk*, N.D., 85 N.W.2d 432 (1957), a case very similar to the case at bar, the North Dakota Supreme Court held that the state court system had jurisdiction of the cause of action. That case was decided before *Williams* and we do not consider that the rationale of the *Vermillion* decision survived *Williams*.[11] In *State ex rel. Iron Bear v. District Court*, Mont., 512 P.2d 1292 (1973), the Montana Supreme Court applied the test of *Williams*, supra, and concluded that state jurisdiction of a divorce action between two reservation In-

dians would not interfere with tribal self–government. However, the reversal of the Montana Supreme Court three years later, when it held that the state courts had jurisdiction of a child–custody dispute involving only reservation Indians, undercuts the force of the *Iron Bear* rationale. *Fisher*, supra. At any rate, we are unpersuaded that the rationale of either *Vermillion* or *Iron Bear* reveals error in our above analysis of the governing United States Supreme Court cases.

We are also cited to our own case of *Torrey v. Baldwin*, 3 Wyo. 430, 26 P. 908 (1891). *Torrey*, a non–Indian, moved his livestock onto the Wind River Indian Reservation (called the Shoshone Reservation in *Torrey*) and maintained that his livestock was exempt from county taxation and that county or state officials could not properly enter the reservation to seize his cattle if the taxes were not paid. Citing recent changes in United States Supreme Court case law, we declined to follow an earlier territorial precedent, *Moore v. Board of County Commissioners*, 2 Wyo. 8 (1878), and held against *Torrey* on both contentions.

We see nothing in this result which supports the contention that the state may assume jurisdiction of a cause of action involving the behavior of reservation Indians on the reservation. *Torrey* is merely consistent with the concept, discussed above, that Wyoming may assert a limited jurisdiction within the Wind River Indian Reservation. The limited jurisdiction was sufficient to tax or seize cattle of a non–Indian. *Torrey* was not concerned with Indian litigants.

## CONSTITUTIONAL PROBLEMS

■ It is urged that the conclusion of exclusive jurisdiction in the tribal court in the case at bar would be a denial of equal protection. Similar equal–protection arguments concerning tribal or federal jurisdiction have been summarily dismissed by the United States Supreme Court on numerous

11. The district court states in its brief that subsequent legislative and constitutional

changes in North Dakota would change the result of *Vermillion* today.

occasions. E. g., *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *United States v. Antelope*, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *Fisher*; *Moe*; and *DeConteau*, supra. The United States Supreme Court has held conclusively that exclusive jurisdiction in a tribal or federal court in the circumstances discussed in this opinion is not a denial of equal protection under the federal constitution. We consider it a moot point whether such exclusive jurisdiction violates Wyoming constitutional guarantees, e. g., the Article 1, Section 8, guarantee of access to the Wyoming courts, because we are dealing with an area of federal law which preempts our own state law.

The writ is granted.

RAPER, Chief Justice, specially concurring.

In my view, this is one of those cases where we must accept with some apprehension a body of law which represents retrogression rather than progress in the functioning of the judicial institution. I have a sense of helplessness and resignation in having to banish Milbank Mutual to an inadequate court to seek relief—to a system of justice within the boundaries of this state which is repugnant to an independent, modern judicature such as we find within the courts of this state and the courts of the federal system. Though the tribal court is a federally sanctioned tribunal, I do not include it as a part of the federal court system to which I refer.

I do not disagree with the opinion of the court, in which I do and must join; the Indian court has exclusive jurisdiction in this case. It is not the function of the majority opinion to discuss the insufficiency of the Indian court system and it was properly avoided; but, I consider the subject appropriate for a separate concurrence for which I am solely responsible. The court's opinion represents the cold logic of the law by which we are bound. My concern is that the United States of America has saddled the citizens of this state and this country with an inferior court system to decide

cases such as the one before us. The Court of Indian Offenses, which is the title of the court variously referred to as an Indian or tribal court, is not one created by an Indian sovereignty—the tribes themselves—but is a court administratively created within the structure of the United States Department of the Interior through its Bureau of Indian Affairs. In what follows, it must be understood that I am not critical of the Indian tribes nor the judges serving on their courts.

A review of the controlling regulations will reveal the intolerable features of the system. The stipulation of the parties and the affidavit of the chief judge of the Wind River Court of Indian Offenses employed by the Bureau of Indian Affairs discloses that the court is operated and acts within 25 C.F.R. § 11.1 through § 11.32C. The judges of the Court of Indian Offenses are appointed by the Commissioner of Indian Affairs subject to confirmation by a two-thirds vote of the tribal council, 25 C.F.R. § 11.3(b). The only qualifications required are that the judge be (1) a member of the tribe under the jurisdiction of the court; and (2) he must never have been convicted of a felony, or within one year last past, of a misdemeanor, 25 C.F.R. § 11.3(d). There is no requirement that judges be legally trained nor any restrictions on who may represent the parties as attorneys—there is no recognized bar.

The tribal council and the Commissioner of Indian Affairs approves, and it would appear designs, the details of judicial procedure, 25 C.F.R. § 11.5(b). There appears to be no provision for a court reporter. Whenever the court is in doubt about any law, treaty or regulation, it may request the superintendent of the reservation to furnish an opinion on the point in question. 25 C.F.R. § 11.12(b). It is not a court of record. It is unbelievable that a judge must go to the executive branch for advice as to how to decide a case.

The law applicable to civil actions is outlined in 25 C.F.R. § 11.23:

"(a) In all civil cases the Court of Indian Offenses shall apply any laws of the

United States that may be applicable, any authorized regulations of the Interior Department, and any ordinances or customs of the tribe, not prohibited by such Federal laws.

"(b) Where any doubt arises as to the customs and usages of the tribe the court may request the advice of counsellors familiar with these customs and usages.

"(c) Any matters that are not covered by the traditional customs and usages of the tribe, or by applicable Federal laws and regulations, shall be decided by the Court of Indian Offenses according to the laws of the State in which the matter in dispute may lie."

Even the designation of the court—Court of Indian Offenses—is inappropriate to a court granted unlimited jurisdiction in civil cases. The customs and usages of the tribes are an unknown quantity and not authoritatively compiled in writing to form a body of law having any predictability in order to determine their effect on the laws of the United States or state of Wyoming. For example, what effect do they have on the Uniform Commercial Code?

The scope of judgments which may be entered are interesting:

"(a) In all civil cases, judgment shall consist of an order of the court awarding money damages to be paid to the injured party, or directing the surrender of certain property to the injured party, or the performance of some other act for the benefit of the injured party.

"(b) Where the injury inflicted was the result of carelessness of the defendant, the judgment shall fairly compensate the injured party for the loss he has suffered.

"(c) Where the injury was deliberately inflicted, the judgment shall impose an additional penalty upon the defendant, which additional penalty may run either in favor of the injured party or in favor of the tribe.

"(d) Where the injury was inflicted as the result of accident, or where both the complainant and the defendant were at fault, the judgment may compensate the injured party for a reasonable part of the loss he has suffered." 25 C.F.R. § 11.24C.

These provisions appear relatively inoffensive as generalities; but when colored by tribal customs and stirred into a hodgepodge of Interior regulations, federal law and state law, no sufficient guidelines are present and a grand state of judicial chaos is bound to result, particularly for the lay judge.

A jury is called when the judge decides, through preliminary proceedings, there is a substantial fact question to be decided. After that decision is made, the "defendant" may request a jury trial. The tribal council prepares a list of eligible jurors. Six jurors are drawn by the judge from the list. Each party to a case may challenge three. A verdict may be rendered by a two–thirds majority vote. 25 C.F.R. § 11.7C. There appears to be no provision which would provide a jury trial in a civil case; or if there is, only the defendant may request one.

Provision for Indian custom divorce and the role of the court is determined by the tribal council, 25 C.F.R. § 11.28, as is tribal custom adoption, 25 C.F.R. § 11.29. Tribal courts may determine paternity and support, 25 C.F.R. § 11.30. It may determine heirs and divide property of decedents, 25 C.F.R. § 11.31, but may not approve wills. The Secretary of the Interior determines validity of wills. 25 C.F.R. § 11.32C.[1]

The appellate system is unique. According to the stipulated facts, the Wind River Court of Indian Offenses is comprised of a chief judge, two associate judges, a clerk of court, an assistant clerk of court, and a bailiff. Under 25 C.F.R. § 11.6C all of the judges of the reservation except the trial judge sit together to hear appeals from judgments made by any judge at the trial

---

1. I am not concerning myself in this concurring opinion with the criminal jurisdiction of Courts of Indian Offenses. The criminal offenses over which it has jurisdiction are petty misdemeanors (six months imprisonment and $500.00 fine), 25 U.S.C. § 1302(7). The court is probably passable for that purpose.

sessions. That leaves an appellate court of two judges. There is to be established by rule of court the limitations, if any, to be placed in for the right of appeal, both as to types of cases which may be appealed and the manner of granting. There does not appear to be any provision for published opinions of the Indian appellate courts which would provide a body of precedent available to those compelled to go into the Indian court system.

It is to this crudely constructed system suitable for handling only the most minor type of litigation that is entrusted the most complex sort of cases with unlimited jurisdiction to afford relief.

In a study by the American Bar Foundation entitled "American Indian Tribal Courts, the Costs of Separate Justice" authored by a research attorney, Samuel J. Brakel,[2] the competency of the system in operation is critically assailed. The author describes tribal courts as little more than "pale copies of the white system." Historically there were no "courts" as "judges" within the Indian society. According to Brakel, much was left to private means of enforcement, appropriate action in many conflict situations being the responsibility of the family or the clan. If resort to more public agencies was had, it might have been to tribal councils, soldier or hunter societies, secular or religious leaders, respected elders, etc. Banishment, public ridicule, and restitution played large roles in traditional Indian dispute resolution. The Indian court is, therefore, artificial—and an unnatural creation superimposed upon the Indian society. That being the case, then the United States government should have established a proper system representing the attributes of the democratic ideal. It is not unusual for us to recognize the jurisdiction of another state and the United States; but those jurisdictions represent the same judicial ideals as ours and recognize the separation of legislative, executive and judicial branches of government.

It is true, as pointed out in the court's opinion, that the legislature of this state is authorized by 25 U.S.C. § 1322 to assume jurisdiction over civil causes arising within Indian country, qualified by 25 U.S.C. § 1326 requiring approval by a majority vote of the adult Indians affected by the assumption. It would be my recommendation that the Wyoming State Legislature enact such enabling legislation in order for the door to be open and the chance that the Indians of the Wind River Reservation may be willing to accept a more satisfactory system. They may not, but at least the opportunity will be present; and it will be no fault of this state that a more acceptable system may not be had.

North Dakota acted under the available federal legislation, but the Indians failed to accept state court jurisdiction. *In Re White-shield*, N.D.1963, 124 N.W.2d 694. The court there held the state legislation to be a disclaimer of state jurisdiction over civil causes of action arising on an Indian reservation, in the absence of acceptance by the Indians. We are, however, in no better situation. Though jurisdiction has not been disclaimed, it simply is not available.

As I understand this court's opinion, in any civil cause of action which arises on the Wind River Reservation and involves Indian defendants, the Court of Indian Offenses has exclusive jurisdiction. If otherwise, state court jurisdiction would constitute interference with tribal self-government. That cuts a wide swath. Within that unlimited scope, I have difficulty identifying a type case which is not covered. The likely result is that there will be a reluctance on the part of Indian and other businessmen to engage in commerce on the reservation with the Indians. Insurance coverage will

---

**2.** Mr. Brakel authored an article prior to publication of the ABA Foundation work. It is entitled "American Indian Tribal Courts: Separate? 'Yes,' Equal? 'Probably Not' " and appears in 62 ABA Jour. 1002 (1976) and generally follows the same critical theme. In 63 ABA Jour. 808 (1977) appears an article entitled "American Indian Courts and Tribal Self Government" by Richard B. Collins, Ralph W. Johnson, and Kathy Imig Perkins which refutes to some extent the assertions of Mr. Brakel. In the same issue of the ABA Journal, at page 813, appears Mr. Brakel's rebuttal.

probably be less available to Indians and become more costly as noted in Justice Rooney's dissent. Wyoming courts must be more cautious in assuming to act in cases related to Indians. It is a shame that within this Equality State there must exist such an island of judicial inadequacy. More importantly, the Indians have been deprived of a satisfactory system of dispute resolution amongst themselves. Many of their internal problems are as vast and perplexing as those arising outside the reservation.

As a result of the court's opinion and decision, there are, of course, residual complications to be confronted. This is not a case in which we can declare our decision prospective *from a particular date.* Such a declaration is only appropriate as to litigation over which we had jurisdiction in the first place. What is the effect of this court's decision upon past state court action falling within the perimeter of Indian court jurisdiction? Will it be void or voidable or what?

While we do not have the type of case before us in which to make the decision: let us say for example, an Indian comes to the district court seeking relief against another Indian over a matter arising in the reservation, in a complex case. Must the district court refuse to assume jurisdiction, though the parties may prefer and stipulate adjudication of the dispute by a court fitted and qualified to handle cases of any magnitude? Ordinarily, parties may not stipulate jurisdiction. Are we by this decision disclaiming state jurisdiction in civil causes such as in North Dakota's *Whiteshield,* supra? Does our opinion have the same effect?

Not only are the citizens of this state affected but so is the unsuspecting traveler from far away who, as pointed out by Justice Rooney in his dissent, may be lulled into a judicial trap when traversing a public highway across the reservation. Must insurance companies exclude coverage when a vehicle is operated on an Indian reservation, as it does for travel into Mexico? While I

do not join in Justice Rooney's dissent, I have high regard for his quest to find state court jurisdiction in this case. Even if his dissenting view were the majority view of the court, it would not affect the larger picture and not reach similar cases arising on other parts of the reservation.

While I am dissatisfied with the effect upon the judicial function, I cannot avoid concurrence with the majority.

ROONEY, Justice, dissenting.

The general law relative to this matter is nicely summarized in the majority opinion, but I do not believe it to be accurately applied to the facts of this case.

The record reflects that approval of the "public highway" here involved occurred on February 18, 1938. See Department of Interior letter dated March 11, 1938. It further reflects that such approval was of a "right–of–way" for a "public highway" pursuant to the "Act of March 3, 1901 (31 Stat. 1084)" (codified into 25 U.S.C. § 311). Such Act reads in pertinent part:

"That the Secretary of the Interior is hereby authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of *public* highways, *in accordance with the laws of the State* or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indians under any laws or treaties but which have not been conveyed to the allottees with full power of alienation." (Emphasis supplied.) [1]

This Act is a grant by the United States, acting through the Congress, of a right–of–way for this highway, and it is an extinguishment of the sovereignty of the Indian tribes over the land used for the highway, with a direction that the laws of Wyoming shall pertain thereto.

1. H.R.Rep.No.2064, 56th Cong. 2d Sess. 3 (1900), refers *to this provision as "[p]roviding* for the opening of highways through * * *

[Indian reservations] *under* State and Territorial laws  *  *  *." (Bracketed material and emphasis supplied.)

The only issue in this case should be resolved on that simple proposition. The ultimate determination as to defendant's liability is properly for the district court.

Common sense would lead to the conclusions that in 1938 the Congress of the United States and the State of Wyoming were well aware of the fact that this highway would be traveled by hundreds of thousands of motorists in the future; that accidents and motor vehicle violations would often occur upon it; that some of the defendants in actions arising therefrom would be enrolled Indians; that the Indian enforcement, investigative, and judicial facilities would be inadequate to handle the same; that legislation and private activities designed for safety and individual protection should not be suspended from applicability to this road—for the benefit of enrolled Indian defendants as well as others;[2] that the state would be spending a large sum of money to construct and maintain the highway, its bridges, its access, its fences, and its other appurtenances; that such expenditure would be wasted if Indian defendants could disregard the state laws which prohibit making holes or trenches in the highway, or destruction of the bridges and fences; and that, generally, the highway must be subject to control of the state.

As reflected in the majority opinion, the tribal court jurisdiction is premised on the "right of the reservation Indians to make their own laws and be ruled by them." *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959). The cornerstone of the majority opinion is the proposition that exclusive jurisdiction lies in the tribal courts in cases involving internal tribal affairs or tribal self–government unless Congress had delegated such jurisdiction to the state. *Williams v. Lee,* supra; *Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); *Kennerly v. District Court of Ninth Judicial District of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); *Fisher v. District Court of Sixteenth Judi-*

*cial District of Montana,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), reh. den. 425 U.S. 926, 96 S.Ct. 1524, 47 L.Ed.2d 772 (1976).

The operation of the highway is *not* an internal tribal affair–it is a *public* affair concerning Indians and non–Indians. It has nothing to do with tribal self–government–the tribe would never have built the highway and the use of the highway by its members is a very small percentage of the total use of it.

Beyond that, Congress *did* delegate the opening and establishment of the highway to the state "in accordance with state laws." Such establishment is not a one–time construction job. It includes the continual maintenance and control of the highway, including traffic regulation and protection as necessary to the purpose of the highway, i. e., to provide the most rapid and convenient movement of traffic consistent with safety. The rules relative thereto must be enforced by the legal entity responsible for the highway and the safety of those using it.

In holding that a tribal Indian living on an Indian reservation was required to register his truck and pay a registration fee for its operation over a state highway within the reservation, the following language was used by the Wisconsin Supreme Court in *State v. Tucker,* 237 Wis. 310, 296 N.W. 645, 647 (1941), in applying the 1901 enactment:

" * * * Such a grant includes by necessary implication the right of the state to take such possession of the land as will enable it to construct and repair and police the road, and to do all things necessary and incidental to the maintenance of a public highway. The fact that it is a public highway implies that no person, Indian or white, may possess, occupy or use it to the exclusion of the general public or use it except on the same terms and upon the same conditions as the general public. * * *

* * * * * *

---

**2.** As examples of legislation: Vehicle registration laws, driver's licensing laws, Safety- Responsibility Act. As examples of private activi-

ties: Insurance policies may have to set forth an exclusion for coverage of vehicles on this highway, causing diverting of traffic therefrom.

"  *  *  * When a public highway operated by the state is the subject of the right of way, the control, policing and other regulations which are inseparable incidents to the maintenance of such a highway must pass to the state and with them, at least in the absence of a clear reservation, the jurisdiction to make them effective.  *  *  * "

The Wisconsin Supreme Court went much further in holding that the established road was no longer part of the reservation and that Indian title to it was voided. The United States District Court, Eastern District of Wisconsin, was critical of this holding as it applied to extinguishment of title. In a case dealing with the same road in *Ex Parte Konaha*, D.C.E.D.Wis., 43 F.Supp. 747, 748 (1942) the court expressed this criticism, but it acknowledged that:

"  *  *  * There might be some basis for the contention that the right to maintain a public highway necessarily extended to regulations reasonably required for the operation of vehicles thereon.  *  *  * "

On appeal of this case to the Court of Appeals, Seventh Circuit, the court said:

"  *  *  * We believe the case before us is materially different from the one before the Wisconsin Supreme Court. Our case deals with a crime, the punishment of a felony. The Wisconsin case dealt with a failure to register an automobile. Our case deals with the crime of manslaughter, covered by Federal statute. The Wisconsin case deals with the application of an automobile registration statute to an Indian member of the same reservation.  *  *  *

*  *  *  *  *  *

"  *  *  * It is true that the grant of a right to maintain a highway must carry with it certain implications respecting the protection of said highway against depredations. If, however, there were any implications arising therefrom which would subject the Indian members to the Wisconsin penal statutes, they would be limited to such penal provisions as served to protect and preserve the highway, such as speeding, impairing the highway, etc."

*Application of Konaha*, 7th Cir. 1942, 131 F.2d 737, 738, 739.

The United States Supreme Court spoke to the 1901 enactment in *United States v. Oklahoma Gas & Electric Co.*, 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716 (1943). Respondent had been granted a license by the state to build and maintain rural electric service lines within the bounds of a right-of-way of a highway established across Indian lands in accordance with the 1901 enactment. The Court said at pages 536, 537 of 63 S.Ct.:

"It is not denied that under the laws of Oklahoma the use made of the highway by respondent, the State's licensee, is a lawful and proper highway use, imposing no additional burden for which a grantor of the highway easement would be entitled to compensation. But the Government denies that the Act of March 3, 1901, providing 'for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated,' submits the scope of the highway use to state law. Its interpretation gives the Act a very limited meaning and substantially confines state law to governing procedures for 'opening and establishment' of the highway. It offers as examples of what is permitted to state determination, whether a state or county agency builds the road, whether funds shall be raised by bond issue or otherwise, and the terms and specifications of the construction contract. The issue is between this narrow view of the State's authority and the broader one which recognizes its laws as determining the various uses which go to make up the 'public highway,' opening and establishment of which are authorized.

"We see no reason to believe that Congress intended to grant to local authorities a power so limited in a matter so commonly subject to complete local control.

"It is well settled that a conveyance by the United States of land which it owns beneficially or, as in this case, for the

purpose of exercising its guardianship over Indians, is to be construed, in the absence of any contrary indication of intention, according to the law of the State where the land lies. Presumably Congress intended that this case be decided by reference to some law, but the Government has cited and we know of no federal statutory or common–law rule for determining whether the running of the electric service lines here involved was a highway use. These considerations, as well as *the explicit reference in the Act to state law in the matter of 'establishment' as well as of 'opening' the highway, indicate that the question in this case is to be answered by reference to that law,* in the absence of any governing administrative ruling, statute, or dominating consideration of Congressional policy to the contrary. We find none of these.

\* \* \* \* \* \*

"In construing this statute as to the incidents of a highway grant we must bear in mind that the Act contemplated a conveyance to a public body, not to a private interest. There was not the reason to withhold continuing control over the uses of the strip that might be withheld wisely in a grant of indefinite duration to a private grantee. It is said that the use here permitted by the State is private and commercial, and so it is. But a license to use the highway by a carrier of passengers for hire, or by a motor freight line, would also be a private and commercial use in the same sense. And it has long been both customary and lawful to stimulate private self–interest and utilize the profit motive to get needful services performed for the public. The State appears to be doing no more than that.

\* \* \* \* \* \*

"The interpretation suggested by the Government is not shown to be necessary to the fulfillment of the policy of Congress to protect a less–favored people against their own improvidence or the overreaching of others; nor is it conceiva-

ble that it is necessary, for the Indians are subjected only to the same rule of law as are others in the State, and then only by permission of the Secretary, subject to compliance with 'such requirements as he may deem necessary.'

"Oklahoma is spotted with restricted lands held in trust for Indian allottees. *Complications and confusion would follow from applying to highways crossing or abutting such lands rules differing from those which obtain as to lands of non–Indians.* We believe that if Congress had intended this it would have made its meaning clear." (Emphasis supplied.)

Referring to the holding in *United States v. Oklahoma Gas & Electric Co.,* supra, that a road opened and established pursuant to the 1901 enactment "was governed by state law," the United States District Court of Montana used the following language in *United States v. Mountain States Telephone and Telegraph Company,* D.C.Mont., 434 F.Supp. 625, 627 (1977), in discussing the applicability of Montana's constitutional provision renouncing jurisdiction over Indian tribal lands:[3]

" \* \* \* Congress, however, has plenary power over Indian lands and could grant to the states the right to build roads across Reservation lands and delineate the usage of such roads. The terms of the grant could be fixed in the congressional act or could be fixed by reference to state law. State law would then control, not because of the power of the state, but because of the congressional adoption of state law as the measure of the federal grant. \* \* \* "

The Tenth Circuit Court of Appeals referred to *United States v. Oklahoma Gas & Electric Co.,* supra, in *United States v. City of McAlester, Oklahoma,* 10th Cir. 1979, 604 F.2d 42, 54, and said:

"Although federal law governs the conveyance of the tribal property, in the absence of a contrary statutory indication state law determines issues relating to

---

**3.** Such a renunciation has been held to be a disclaimer of proprietary interest rather than

governmental interest. *Kake v. Egan,* supra, 82 S.Ct. at 567.

the scope of an easement over tribal property once granted. [Citation.] Thus we must focus primarily on Oklahoma law dealing with rights of the parties where such an easement exists."

The case involved eminent domain power under the Curtis Act for a watershed and basin acquisition.

In this case, we are not called upon to determine the extent of jurisdiction conferred upon the state by virtue of the 1901 enactment vis–a–vis crimes committed on the highway having no relation to regular highway activity, safety or maintenance or vis–a–vis civil actions growing out of other than highway related activities, safety or maintenance. The facts of this case concern the leaving of a gate open on highway fencing which was installed by the highway department to prevent such occurrences as here took place, i. e., relator's horse allegedly went onto the highway and caused damages to a passing motorist. I would hold that such is within the purview of the jurisdiction conferred on the state by the 1901 enactment.

I would hold that such enactment confers jurisdiction on the state for all actions resulting from activities occurring on the highway having a relation to the purpose of the highway, i. e., safe movement of traffic. Many Wyoming laws pertain to this purpose, including general laws having to do with tort liability in operation of motor vehicles and per se negligence as results from violation of statutory laws. Of possible pertinency in this instance, are statutory laws enacted for maintenance of, and

safety on, highways such as construction and repair of fences on highways (§ 24–1–112, W.S.1977), leaving gates open (§ 11–28–107, W.S.1977), and obstructing highways (§ 35–10–401, W.S.1977).[4]

This jurisdiction is not a result of a diminishment of the reservation area or of Indian country. It is simply a result of congressional action directing the application of state laws to matters on the highway having to do with its purpose. See quotation, supra, from *United States v. Mountain States Telephone and Telegraph Company*, 434 F.Supp. at 627.

Finally, I would note that this treatment of jurisdiction as conferred by the 1901 enactment is in recognition that that enactment provides for express application of state law upon approval of the establishment of the highway. Therefore, it is not in conflict with *Williams v. Lee*, supra, which premises its holding on the absence of "governing Acts of Congress" (see third paragraph under "The Supreme Court Case Law" heading of the majority opinion). Nor is it in conflict with the jurisdiction placed in the United States for offenses committed in Indian country by 18 U.S.C. § 1152 (1966) inasmuch as that section begins "Except as otherwise expressly provided by law  *  *  *."[5]

The grant of permission to "open and establish" this highway through the Indian reservation "in accordance with the laws of the state" is simply an application of common sense. The rules of the road should be enforced by the entity primarily responsible for the road.[6] The deaths on our highways

4. In other instances and perhaps in this instance, laws for maintenance of, and safety on, highways could include regulation of traffic on highways (§§ 31 5 101 through 31·5 1214, W.S.1977), Implied Consent Law (§§ 31 6 101 through 31 6 106, W.S.1977), Driver's License Act (§§ 31 7 101 through 31 7-138, W.S. 1977), Safety Responsibility Act (§§ 31 9 101 through 31 9 414, W.S.1977), Uninsured Motor Vehicles (§§ 31 10 101 through 31-10-104, W.S.1977), Protection of Highways (§§ 31 12 101 through 31 12 206, W.S.1977), etc.

5. There is no present effort to enlarge the present jurisdiction of federal courts. To the contrary, heavy dockets in such courts have

resulted in congressional efforts to restrict some of the grounds for federal court jurisdiction, such as "diversity" requirements, to the end of transferring some cases from the federal court dockets to state court dockets.

6. The incongruity of any other arrangement is illustrated by the David Lohnes case. He was an Indian. He was walking down the street on the Fort Totten Indian Reservation (no indication that the street was established pursuant to the 1901 enactment) when he was hit by a car being driven by another Indian. His action in state court was dismissed for lack of jurisdiction. He subsequently filed an action in the United States District Court, it was also dis-

exceed those caused by almost every other cause. The purpose of statutes regulating and effecting automobile traffic on our highways is to promote public safety. *Zanetti Bus Lines, Inc. v. Logan*, Wyo., 400 P.2d 482 (1965). State regulations are the motorists' only protection upon highways maintained and patrolled by the state.[7] The three "E's" of traffic safety are engineering, education and enforcement. They must work in harmony. The Wyoming courts must have jurisdiction to enforce those laws which have for their purpose the control of highway–related safety, highway–related activities and highway–related maintenance, be they civil or criminal.

I would deny the petition for a writ of prohibition.

missed since jurisdiction was vested in the tribal court. *Lohnes v. Cloud*, D.C.N.D., 366 F.Supp. 619 (1973). The tribal court gave him. a judgment for $10,000. Lohnes petitioned for payment out of the North Dakota Unsatisfied Judgment Fund (Wyoming has the Uninsured Motor Vehicle Act for the same purpose). Payment was denied because the judgment was from tribal court. *Lohnes v. Cloud*, N.D., 254 N.W.2d 430 (1977).

7. See §§ 31 2–103 and 31 2 104, W.S.1977.