## LUMBERMEN'S MUTUAL CASUALTY CO. *v.* ELBERT.

No. 11.   Argued October 14, 1954.—Decided December 6, 1954.

*Charles L. Mayer* argued the cause for petitioner. With him on the brief was *Joseph H. Jackson.*

*John M. Madison* and *Whitfield Jack* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case concerns the Louisiana direct action statute. This Court has today had occasion to test that statute against certain claims of unconstitutionality, *Watson* v. *Employers Liability Assurance Corp., post,* p. 66.[1] Questions are raised here involving the diversity jurisdiction of the federal courts in cases arising under the statute.

Respondent, a citizen of Louisiana, was injured in an automobile accident at Shreveport, Louisiana, allegedly because of the negligence of Mrs. S. W. Bowen, also a Louisiana citizen. Petitioner, an Illinois corporation, had issued a public liability policy to Mr. Bowen insuring him and members of his household against claims arising from their negligent operation of the family car. The policy was applied for, issued, and delivered within the State of Louisiana. Petitioner was certificated to do business in Louisiana and had, as a legal prerequisite thereto, consented in writing to be sued directly for damages sustained in Louisiana accidents involving its policyholders.

The pertinent portion of the direct action statute provides:

> "The injured person or his or her heirs, *at their option,* shall have a right of direct action against the insurer within the terms and limits of the policy in the parish where the accident or injury occurred or

---

[1] See also *McDowell* v. *National Surety Corp.,* 68 So. 2d 189, appeal dismissed, 347 U. S. 995.

in the parish where the insured has his domicile, and *said action may be brought against the insurer alone* or against both the insured and the insurer, jointly and in solido." La. Rev. Stat., Tit. 22, § 655. (Italics added.)

Pursuant to this provision, respondent brought this action against petitioner in the United States District Court for the Western District of Louisiana, alleging diversity of citizenship and damages in excess of $3,000. Mrs. Bowen, the alleged tortfeasor, was not made a codefendant. Petitioner moved to dismiss the complaint for lack of federal jurisdiction; the district judge granted the motion. 107 F. Supp. 299, 108 F. Supp. 157. The Court of Appeals reversed and remanded the case to the District Court for trial, 201 F. 2d 500, one judge dissenting from the denial of a petition for rehearing. 202 F. 2d 744. From that decision, this Court granted certiorari. 347 U. S. 965. Thus, the sole question to be decided is whether the United States District Court in Louisiana has jurisdiction over this suit for damages brought under the direct action statute against the wrongdoer's insurer alone, where diversity of citizenship exists between the complainant and the defendant insurer but not between the complainant and the wrongdoer.

Section 1332 (a) of the Judicial Code, 28 U. S. C. § 1332 (a), reads as follows:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $3,000 exclusive of interest and costs, and is between:

"(1) Citizens of different States . . . ."

It is petitioner's contention that the "matter in controversy" here is the underlying tort liability of the alleged wrongdoer. If this were true, of course, no diversity of citizenship would exist between respondent and Mrs.

Bowen, as the real party-defendant in interest. But the Louisiana courts have differentiated between actions brought by an injured party against the insurer alone and those brought against either the tortfeasor alone or together with the insurer. In the former action, the insurer is foreclosed from asserting defenses such as coverture, normally available to the tortfeasor. *Edwards* v. *Royalty Indemnity Co.,* 182 La. 171, 161 So. 191. Similarly, the insurer is severely restricted in advancing technical defenses based upon the terms of the policy, such as a failure of notice, when the injured party brings a direct action. *Jackson* v. *State Farm Mut. Automobile Ins. Co.,* 211 La. 19, 29 So. 2d 177. While either type of action encompasses proof of the tortfeasor's negligence, in the separate suit against the insurer a plaintiff must also establish liability under the policy. The Louisiana courts have characterized the statute as creating a separate and distinct cause of action against the insurer which an injured party may elect *in lieu* of his action against the tortfeasor. *West* v. *Monroe Bakery,* 217 La. 189, 46 So. 2d 122; *Jackson* v. *State Farm Mut. Automobile Ins. Co., supra.*

Petitioner is therefore not merely a nominal defendant but is the real party in interest here. This conclusion to disregard the tortfeasor's citizenship in the instant case for purposes of federal jurisdiction is fortified by cases honoring the states' characterization of a guardian or other fiduciary as determinative of the real party in interest in federal litigation. *New Orleans* v. *Gaines's Administrator,* 138 U. S. 595; *Mexican Central R. Co.* v. *Eckman,* 187 U. S. 429. There is even greater justification for disregarding the tortfeasor's citizenship here than for disregarding the citizenship of a beneficiary since the insurer—unlike a fiduciary—has a direct financial interest in the outcome of this litigation.

Petitioner next asserts that the tortfeasor is an indispensable party to this litigation, and that failure to join

her as a defendant deprives the federal court of jurisdiction. Clearly under the Louisiana statute and practice the argument has no merit.[2] And the circumstances which have led the federal courts to findings of indispensability are not present here. In *Shields* v. *Barrow*, 17 How. 130, 139, indispensable parties were defined as "Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."[3] The tortfeasor in a Louisiana direct action against the insurer is not such a person. The state has created an optional right to proceed directly against the insurer; by bringing the action against petitioner, respondent has apparently abandoned her action against the tortfeasor.[4] See *Miller* v. *Commercial Standard Ins. Co.*, 199 La. 515, 526, 6 So. 2d 646, 649. Thus a complete disposition of the entire claim may be made in this one action, without injustice to any of the participants.

Finally, petitioner contends that the federal courts should decline, as a matter of discretion, to exercise their jurisdiction over suits against an insurer alone. This argument is based upon the differing standards of review on appeal of a jury verdict in the Louisiana and federal

---

[2] Two proposals for compulsory joinder of insured and insurer as party-defendants have failed of passage in the Louisiana Legislature within recent years. See La. Senate Bill 73, 1952 Session; La. House Bill 600, 1954 Session.

[3] See also 3 Moore's Federal Practice (2d ed. 1948), ¶ 19.07 *et seq.;* Note, Indispensable Parties in the Federal Courts, 65 Harv. L. Rev. 1050 (1952).

[4] No case has been cited, although there has been nearly a quarter-century of experience under the direct action statute, where an injured party has attempted to bring suit against the tortfeasor following an unsuccessful suit against the insurer in either state or federal courts.

courts.[5] Petitioner relies upon *Burford* v. *Sun Oil Co.,* 319 U. S. 315, as authority for the suggested discretionary refusal to exercise jurisdiction.[6] But in *Burford,* jurisdiction was declined to avoid a potential interference with a state's administrative policy-making process, a consideration not present here. Moreover, traditional equitable authority, not available here, was relied upon to justify the holding.

The language of the congressional grant of jurisdiction to the lower courts, 28 U. S. C. § 1332 (a), is clear, and this case seems to us to fall squarely within the provision. In Louisiana the practice of bringing direct actions in the federal courts has long been recognized. See, *e. g., New Amsterdam Casualty Co.* v. *Soileau,* 167 F. 2d 767 (C. A. 5th Cir.), cert. denied, 335 U. S. 822; *Bankers Indemnity Ins. Co.* v. *Green,* 181 F. 2d 1 (C. A. 5th Cir.); *Belanger* v. *Great American Ind. Co.,* 188 F. 2d 196 (C. A. 5th Cir.). Neither federal nor Louisiana law suggests any reason to disturb this practice. The decision of the Court of Appeals is

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

Not deeming it appropriate now to question *Meredith* v. *Winter Haven,* 320 U. S. 228, I join the Court's opinion. But our holding results in such a glaring perversion of the

---

[5] Appellate review in the federal courts is, of course, limited ultimately by the Seventh Amendment. *Parsons* v. *Bedford, Breedlove & Robeson,* 3 Pet. 433. In Louisiana, appellate review in civil cases extends to both matters of law and fact. See La. Const., Art. 7, §§ 10, 29.

[6] See also *Pennsylvania* v. *Williams,* 294 U. S. 176; *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293; *Alabama Public Service Commission* v. *Southern R. Co.,* 341 U. S. 341, cited in the dissenting opinion below. See *Meredith* v. *Winter Haven,* 320 U. S. 228, 234, 236, 237.

purpose to which the original grant of diversity jurisdiction was directed that it ought not to go without comment, as further proof of the mounting mischief inflicted on the federal judicial system by the unjustifiable continuance of diversity jurisdiction.

The stuff of diversity jurisdiction is state litigation. The availability of federal tribunals for controversies concerning matters which in themselves are outside federal power and exclusively within state authority, is the essence of a jurisdiction solely resting on the fact that a plaintiff and a defendant are citizens of different States. The power of Congress to confer such jurisdiction was based on the desire of the Framers to assure out-of-state litigants courts free from susceptibility to potential local bias.   That the supposed justification for this fear was not rooted in weighty experience is attested by the fact that so ardent a nationalist as Marshall gave that proposal of the Philadelphia Convention only tepid support in the Virginia Convention.   3 Elliot's Debates 556 (1891). But in any event, whatever "fears and apprehensions" * were entertained by the Framers and ratifiers, there was fear that parochial prejudice by the citizens of one State toward those of another, as well as toward aliens, would lead to unjust treatment of citizens of other States and foreign countries.

Such was the reason for enabling a citizen of one State to press a claim or stand on a defense, wholly state-created, against a citizen of another in a federal court of the

---

* "However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states." *Bank of the United States* v. *Deveaux*, 5 Cranch 61, 87.

latter's State. The abuses to which this opportunity was put when, more than a hundred years ago, corporations began their transforming influence on American economic and social life are familiar history. Their classic exposition in Gerard C. Henderson's *Position of Foreign Corporations in American Constitutional Law* has lost neither its vividness nor force during the intervening decades. The short of the matter is that by resorting to the federal courts the out-of-state corporation sought to gain, and much too frequently did, an advantage as against the local citizen. Instead of protecting out-of-state litigants against discrimination by state courts, the effect of diversity jurisdiction was discrimination against citizens of the State in favor of litigants from without the State.

Diversity jurisdiction aroused opposition from its very inception, but the modern manifestation of these evils through corporate litigation gathered increasing hostility and led to repeated congressional attempts at restriction and eventually of abolition. The proliferation of the doctrine of *Swift* v. *Tyson,* 16 Pet. 1, brought into lurid light the discriminatory distortions to which diversity jurisdiction could be subverted by judicial sanction of professional astuteness. The growing sense of the injustice of these developments and its serious hurt to the prestige of the federal courts in the exercise of their essential jurisdiction, came to a head with the decision in *Black & White Taxicab & Transfer Co.* v. *Brown & Yellow Taxicab Co.,* 276 U. S. 518. The federal courts became the target of acrimonious political controversy. In the course of our history this was not the first time that diversity jurisdiction played the federal courts an ill turn. Again and again in the 60's and the 70's and the 80's such a conflict had flared up, but in the earlier periods it was by way of being a conflict between the financial East and the agrarian West. This time President Hoover's Attorney Gen-

eral and Senator George W. Norris of Nebraska united against the disclosed evils of diversity jurisdiction.

Attorney General Mitchell urged on Congress a measure whereby a corporation should be deemed, for diversity purposes, a citizen of any State in which it carries on business "as respect all suits brought within that State between itself and residents thereof and arising out of the business carried on in such State." Hearings before Subcommittee of Senate Committee on the Judiciary on S. 937, S. 939 and S. 3243, 72d Cong., 1st Sess. 4. At the same time, the Senate Judiciary Committee, under the leadership of Chairman Norris, went further. Twice it reported bills for the abolition of diversity jurisdiction. S. Rep. No. 691, 71st Cong., 2d Sess.; S. Rep. No. 530, 72d Cong., 1st Sess. Legislative attempts at correction have thus far failed. But by overruling the doctrine of *Swift* v. *Tyson,* despite its century-old credentials, this Court uprooted the most noxious weeds that had grown around diversity jurisdiction. What with the increasing permeation of national feeling and the mobility of modern life, little excuse is left for diversity jurisdiction, now that *Erie Railroad Co.* v. *Tompkins,* 304 U. S. 64, has put a stop to the unwarranted freedom of federal courts to fashion rules of local law in defiance of local law.

A legal device like that of federal diversity jurisdiction which is inherently, as I believe it to be, not founded in reason, offers constant temptation to new abuses. This case is an instance. Here we have not an out-of-state litigant resorting to a federal court to be sure of obtaining for himself the same treatment which state courts mete out to their own citizens. Here we have a Louisiana citizen resorting to the federal court in Louisiana in order to avoid consequences of the Louisiana law by which every Louisiana citizen is bound when suing another Louisiana citizen. If Florence R. Elbert, the

present plaintiff, had to sue the owner of the offending automobile which caused her injury, or if she were suing an insurance company chartered by Louisiana, she would have no choice but to go, like every other Louisiana plaintiff who sues a fellow citizen of Louisiana, to a Louisiana state court and receive the law as administered by the Louisiana courts. But by the fortuitous circumstance that this Louisiana litigant could sue directly an out-of-state insurance company, she can avoid her amenability to Louisiana law. In concrete terms, she can cash in on the law governing jury trials in the federal courts, with its restrictive appellate review of jury verdicts, and escape the rooted jurisprudence of Louisiana law in reviewing jury verdicts. There is, to be sure, a kind of irony for corporate defendants to discover that two can play at the game of working, to use a colloquial term, the perverse potentialities of diversity jurisdiction. But it is not the less unreason and no greater fairness for a citizen of the forum to gain a discriminatory advantage over fellow citizens of his State, than it is for an out-of-state citizen to secure more than the same treatment given local citizens, by going to a federal court for the adjudication of state-created rights.

This case, however, stirs anew an issue that cuts deeper than the natural selfishness of litigants to exploit the law's weaknesses. My concern is with the bearing of diversity jurisdiction on the effective functioning of the federal judiciary. Circuit Judge Rives agreed with the district judge that this kind of action has no business in a federal court. In dissenting from denial of the petition for rehearing, he stated with impressive bluntness the effect on the work of the federal and state courts in allowing diversity jurisdiction to be put to such purposes:

> "On the original hearing, I had strong misgivings which were submitted to my brothers, but I was

unable to crystallize my thinking clearly enough to justify a dissent. Continued consideration of the question has convinced me that there is something fundamentally wrong with our legal theories when they permit the great bulk of the casualty damage suit litigation in Louisiana to clog the dockets of the federal courts, while, I understand, some of the state judges actually do not have enough litigation to keep them busy." *Elbert* v. *Lumbermen's Mut. Cas. Co.,* 202 F. 2d 744.

In Louisiana, plaintiffs in negligence suits have suddenly found the federal courts their protectors and insurance companies have discovered the virtues of the state courts. In New York, insurance companies run to cover in the federal courts and plaintiffs feel outraged by the process of attrition in enforcing their claims, due to a delay of from three to four years before a case can come to trial. As to both situations, the vice is the availability of diversity jurisdiction. What is true of New York is true, in varying degrees, of every big center.

Diversity cases have long constituted a considerable portion of all civil cases filed in the federal courts. For the last ten years the proportion of diversity cases has greatly increased, so that it is safe to say that diversity cases are now taking at least half of the time that the District Courts are devoting to civil cases. (This is the conclusion of the Division of Procedural Studies and Statistics of the Administrative Office of the United States Courts.) The rise in motor-vehicle registration from 32 million in 1940 to 56 million in 1953 has inevitably been reflected in increasing resort to diversity jurisdiction in ordinary negligence suits. The consequences that this entails for the whole federal judicial system—for increase in the business of the District Courts means increase in the business of the Courts of Appeals and a swelling of

the petitions for certiorari here—cannot be met by a steady increase in the number of federal judges. The business of courts, particularly of the federal courts, is drastically unlike the business of factories. The function and role of the federal courts and the nature of their judicial process involve impalpable factors, subtle but far-reaching, which cannot be satisfied by enlarging the judicial plant. A recent report of the House Committee on the Judiciary proposed an increase of the required amount in controversy for jurisdiction of the federal courts from $3,000 to $10,000. Referring to the consequences of "a tremendous increase in the number of cases filed," it felt that appointment of additional judges "has done much to alleviate the problem" but recognized that merely multiplying judges is no solution. See H. R. Rep. No. 1506, 82d Cong., 2d Sess. 1. In the farthest reaches of the problem a steady increase in judges does not alleviate; in my judgment, it is bound to depreciate the quality of the federal judiciary and thereby adversely to affect the whole system.

Since diversity jurisdiction is increasingly the biggest source of the civil business of the District Courts, the continuance of that jurisdiction will necessarily involve inflation of the number of the district judges. This in turn will result, by its own Gresham's law, in a depreciation of the judicial currency and the consequent impairment of the prestige and of the efficacy of the federal courts. Madison believed that Congress would return to the state courts judicial power entrusted to the federal courts "when they find the tribunals of the states established on a good footing." 3 Elliot's Debates 536 (1891). Can it fairly be said that state tribunals are not now established on a sufficiently "good footing" to adjudicate state litigation that arises between citizens of different States, including the artificial corporate citizens, when they are the only

resort for the much larger volume of the same type of litigation between their own citizens? Can the state tribunals not yet be trusted to mete out justice to non-resident litigants; should resident litigants not be compelled to trust their own state tribunals? In any event, is it sound public policy to withdraw from the incentives and energies for reforming state tribunals, where such reform is needed, the interests of influential groups who through diversity litigation are now enabled to avoid state courts?