The FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity

v.

Marvin L. CAPLAN, et al.

Civ. A. No. 92–2189.

United States District Court, W.D. Louisiana, Alexandria Division.

Dec. 3, 1993.

John A. Broadwell, U.S. Atty.'s Office, Shreveport, LA, J. Christopher Kohn, David

**1126**

S. Klontz, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Richard L. McGimsey, Steffes & MacMurdo, Baton Rouge, LA, William B. Owens, Crowell & Owens, Alexandria, LA, for Marvin L. Caplan, John F. Marzullo, Paul Price, Darrel V. Willet, Sr.

Richard L. McGimsey, Steffes & MacMurdo, Baton Rouge, LA, for Claude Davis, Jr.

William H. Delaunay, Jr., H. Brenner Sadler, Stephen D. Wheelis, Provosty Sadler et al, Alexandria, LA, for Ralph W. Graham, A.A. Kelley, Jr., John F. Marzullo.

Charles S. Weems, III, Gold Weems et al, Alexandria, LA, for Louis Joseph, Jr., and Stafford G. Kees Succession, Sr.

Wade N. Kelly, William J. Mize, Mary Louise Fullington, Carmouche Law Firm, Lake Charles, LA, for Ragan K. Nelson.

Richard L. McGimsey, Steffes & MacMurdo, Baton Rouge, LA, Steven E. Adams, McCollister & McCleary, Baton Rouge, LA, William B. Owens, Crowell & Owens, Alexandria, LA, for Curt H. Smith, Robert B. Tudor, Jr.

Eugene R. Preaus, Kyrstil B. Cook, Preaus Roddy & Krebs, New Orleans, LA, for Fidelity & Deposit Co. of Maryland.

Wade N. Kelly, William J. Mize, Mary Louise Fullington, Carmouche Law Firm, Lake Charles, LA, for Ragan K. Nelson.

Eugene R. Preaus, Preaus Roddy & Krebs, New Orleans, LA, for Fidelity & Deposit Co. of Maryland.

### RULING

LITTLE, District Judge.

The issues before the court on this motion and cross-motion for summary judgment concern the requirement of notice under a claims-made directors and officers' liability insurance policy ("D & O policy"). The movant insurance company, Fidelity and Deposit Company of Maryland ("F & D"), asserts that the insured directors and officers failed to comply with the notice requirement of the D & O policy. Therefore, F & D concludes that it is excused from all liability for the insureds' alleged wrongdoing and it should be dismissed as a party defendant in this suit. The opponent, Federal Deposit Insurance Corporation ("FDIC"), disputes F & D's contention that the insureds failed to give the requisite notice, but asserts that even if the insureds did not adequately perform their contractual obligations, F & D remains liable for the insureds' wrongdoing under the Louisiana Direct Action Statute. The FDIC thus concludes that summary judgment should appropriately be granted in its favor. The facts are stipulated. For the reasons that follow, this court GRANTS F & D's motion, DENIES the FDIC's cross-motion, and DISMISSES F & D as a party defendant.

### I.

In August 1985, F & D issued a claims-made D & O policy to First Citizens Bancshares Corporation, the holding company for First Bank of Pineville, Louisiana ("First Bank" or "the bank"). The policy covered the period from 7 August 1985 to 7 August 1986.

The policy insured First Bank's directors and officers against liability for: (i) actual claims[1] asserted against them during the policy term, and (ii) "wrongful acts"[2] which they committed during the policy term, but which gave rise to claims asserted against them after the policy terminated (hereinafter "potential claims").[3] The policy required, as

---

1. The policy did not define what constitutes a "claim."

2. "Wrongful act" was defined in the policy as: any actual or alleged error, misstatement, misleading statement, act or omission or neglect or breach of duty by the Directors and Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Bank individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of the Bank.

3. The policy also insured the bank against liability for claims of indemnity asserted by the directors and officers. The insuring clause of the policy stated:

   [F & D] agrees:
   (a) with the Directors and Officers of the Bank that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, [F & D] will pay, in accordance with the terms of this policy, on behalf of the

a condition precedent to coverage, that the directors and officers (or the bank) give F & D written notice of claims, "as soon as practicable," but not later than the date the policy terminated.[4]  In the event F & D canceled or refused to renew the policy, the directors and officers (or the bank) could elect to extend the time for communicating notice of claims beyond the termination date; however, coverage was limited to wrongful acts that occurred prior to the policy's termination date.[5]

Upon issuing the D & O policy, F & D implemented procedures to monitor First Bank's financial performance and continued eligibility for coverage.  Throughout the policy term, F & D kept a close watch on (i) the bank's capital to asset ratio and (ii) the aggregate value of the bank's past-due loans.  As the policy term neared its conclusion, these indicia of financial stability deteriorated.  The bank's capital to asset ratio fell from 6.1% in June 1985 to 5.8% in August 1986.  Past due loans increased from $252,-000 in March 1985 to $989,691 in May 1986.  Despite these signs of malady, however, when the policy term expired F & D authorized a one-year extension or "renewal" of the bank's D & O liability insurance-subject to the addition of certain endorsements and exclusions of coverage not present in the original policy.

In addition to the standard exclusions listed in the bank's original D & O policy, the renewal policy excluded coverage for: loans to insiders, adversely classified loans, and regulatory noncompliance.  In correspondence with the bank's insurance agent R.W. Graham (a member of the bank's board of directors and a defendant in this suit), F & D explained that the additional exclusions were necessary to offset the added risk presented by the bank's deteriorated financial condition.  Graham forwarded this information to the bank's president, defendant John Marzul-

---

Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay, except for such Loss to which the Bank shall indemnify the Directors and Officers;

(b) with the Bank that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Company will pay, in accordance with the terms of this policy, on behalf of the Bank, all Loss as to which the Bank may be required or permitted by law to indemnify the Directors and Officers.

4. The notice requirement was stated as follows:

6. NOTICE OF CLAIMS

(a) If during the policy period, or during the extended discovery period if the right is exercised by the Bank or the Directors and Officers in accordance with Clause 2, the Bank or the Directors and Officers shall:

(1) receive written or oral notice from any party that it is the intention of such party to hold the Directors and Officers, or any of them, responsible for a specified Wrongful Act; or

(2) become aware of any act, error or omission which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a specified Wrongful Act;

and *shall during such period give written notice thereof to the Company [F & D] as soon as practicable and prior to the date of termination of the policy,* then any claim which may subsequently be made against the Directors and Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the Policy Year or the extended discovery period in which such notice was first given.

(b) The Bank or the Directors and Officers shall, as a condition precedent to their rights under this policy, give to the Company notice in writing as soon as practicable of any claims made and shall give the Company such information and cooperation as it may reasonably require.

(emphasis added).

5. This extended reporting period, or "discovery," option was described in the policy as follows:

2. EXTENSION

Discovery Clause—If the Company [F & D] shall cancel or refuse to renew this policy, the Bank or the Directors and Officers shall have the right, upon payment of thirty-five percent (35%) of the one year prepaid premium or twelve and one-half percent (12½) of the three year prepaid premium set forth in Item 5 of the Declarations, to an extension of the coverage granted by this policy *with respect to any claim or claims which shall be made against the Directors and Officers during the period of ninety days after the date of such cancellation or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or non-renewal.*  This right of extension shall terminate unless written notice is given to the Company, together with payment of the appropriate premium, within ten (10) days after the effective date of cancellation or non-renewal of the policy.

(emphasis added) (as amended by "Limitation of Discovery Period Endorsement").

lo, and urged him to review the additional exclusions carefully. Marzullo directed the bank to pay the renewal premium in accordance with the policy terms.

Meanwhile, as F & D was evaluating the bank's eligibility for insurance coverage, the FDIC was examining the bank's lending practices. In October 1986, the FDIC issued a report criticizing the bank's officers, for their "liberal lending philosophy," and the bank's directors, for their failure to adequately supervise the lending function. The report noted the bank's failure to maintain the regulatory minimum capital to asset ratio (6.0%) and threatened civil penalties of $1,000 per day for continued violations. The FDIC held a meeting with the bank's directors and officers in December 1986 to discuss this report and informed them that the FDIC considered the bank a "problem institution" and that the FDIC would probably pursue a cease and desist action to obtain regulatory compliance.

Despite the pressure applied by the FDIC, First Bank's wounds continued to bleed. As of 31 December 1986, the bank reported a capital to asset ratio of 5.3% and past due loans of $3,500,000. A bank rating service downgraded its assessment of the bank. F & D then canceled the bank's D & O policy. By registered mail dated 26 February 1987, F & D's underwriter informed the bank's designated agent (defendant Marzullo) that the bank's D & O insurance coverage would cease, effective 2 April 1987. At Marzullo's instance, the bank exercised the "discovery" option to extend the time for communicating notice of claims until 1 July 1987.

On 31 March 1987, Marzullo sent a letter to F & D stating that First Bank had become aware of "an act, error or omission, which may subsequently give rise to a claim being made against the directors and officers ... for a specified wrongful act." The letter did not describe the underlying "specified wrongful act" upon which potential claims were based; however, it identified the source of such claims as the FDIC. The letter stated, "the [b]ank has received written and oral notice ... that it is the [FDIC's] intention to hold the directors and officers ... responsible for any wrongful acts noted or in connection with [an examination performed by the FDIC]." [6]

On 21 May 1987, F & D responded to Marzullo's letter by informing him that the terms of the D & O policies required that he provide specific information regarding "wrongful acts" that may give rise to claims being asserted against the bank's directors and officers. F & D requested that Marzullo promptly inform it of the nature of any wrongful acts that may subsequently give rise to a claim, or advise it of any notice Marzullo had received that the directors and officers would be held liable for wrongdoing. Marzullo did not respond, and the "discovery period" expired on 1 July 1987 without further communication between First Bank and F & D.

Following the expiration of the discovery period, First Bank renewed its relationship with the FDIC. On 13 July 1987, the bank's directors and officers met with the FDIC and entered into a "corrective action resolution" in an attempt to bring the bank into regulatory compliance. On 11 March 1988, howev-

---

**6.** Marzullo's letter stated, in pertinent part:

Pursuant to Clause # 6, "Notice of Claims" of the Policy, Fidelity and Deposit Company of Maryland (the "Insurer") is hereby placed on notice that First Citizens Bancshares Corporation (the "Company" as noted in Item 1 of the Policy as the Insured) has become aware of an act, error or omission, which may subsequently give rise to a claim being made against the directors and officers of the Company or against the directors and officers of First Bank, Pineville, Louisiana (the "Bank"), or any of them, for a specified wrongful act. Wrongful acts which have come to the attention of the Company could arise in connection with an examination performed by the Federal Deposit Insurance Corporation (the "FDIC"). Pursuant to said examination, a report was issued wherein First Bank, subsidiary of said Company and entitled to coverage pursuant to Clause # 1, is hereby being cited by the FDIC for practices which if proven could give rise to a claim or claims pursuant to the aforementioned policy. Furthermore, the Insurer is hereby placed on notice that the Company and the Bank has [sic] received written and oral notice from the FDIC that it is the intention of the FDIC to hold the directors and the officers of the Company and the Bank, or any of them, responsible for any wrongful acts noted or in connection with the FDIC examination.

er, the FDIC conducted an examination of First Bank and later issued a report critical of the bank's directors and officers. On 7 July 1989, the FDIC conducted another examination of the bank and issued another report criticizing the bank's directors and officers. On 10 November 1989, FDIC conducted a final examination of the bank and, based on its findings, recommended that the bank be closed.

On 8 December 1989, the Office of the Comptroller of the Currency declared the bank insolvent and appointed the FDIC as receiver. The FDIC, as receiver, then assigned certain bank assets—including the bank's right to assert claims against its directors and officers—to the FDIC in its corporate capacity. On 7 December 1992, the FDIC filed the present suit against certain former directors and officers of First Bank (and against F & D pursuant to the Louisiana Direct Action Statute). In its complaint, the FDIC alleged that the named directors and officers were grossly negligent and breached their fiduciary duties, causing First Bank to sustain losses in excess of $5 million.

On 10 May 1993, F & D moved for summary judgment. F & D alleged that the insureds (the defendant directors and officers and the bank) failed to give timely notice of claims as required by the D & O policy. Thus, F & D concluded that the FDIC's claims, as derived from the bank's rights under the policies, were precluded as a matter of law. The FDIC opposed F & D's motion and filed a cross-motion for summary judgment, alleging that President Marzullo's 31 March 1987 letter was sufficient to put F & D on notice of a potential claim against the defendant directors and officers. Alternatively, the FDIC alleged that it stood in the shoes of an "injured party" under the Louisiana Direct Action Statute, and as such, it could proceed against F & D despite any notice deficiency.

## II.

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

The underlying facts are not in dispute. Thus, the court is charged with determining, as a matter of law: (i) whether Marzullo's letter was sufficient to invoke coverage under the F & D policy, and (ii) if not, whether failure to give notice of claims was excused under the Louisiana Direct Action Statute. *See Guaranty Nat'l Ins. Co. v. North River Ins. Co.,* 909 F.2d 133, 135 (5th Cir.1990). Louisiana substantive law guides the court's determination of these issues. *See Old Republic Ins. Co. v. Comprehensive Health Care Assoc.,* 2 F.3d 105, 107 (5th Cir.1993).

### A.

Under Louisiana law, "insurance contracts are to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another." *Gulf Island, IV v. Blue Streak Marine, Inc.,* 940 F.2d 948, 952 (5th Cir.1991) (quotation marks, citation omitted). Moreover, such contracts must be enforced as written so long as the terms are clear and unambiguous and do not lead to absurd consequences. La.Civ.Code Ann. art. 2046 (West 1992); *Pareti v. Sentry Indem. Co.,* 536 So.2d 417, 420 (La.1988); *Oil Well Supply Co. v. New York Life Ins. Co.,* 214 La. 772, 38 So.2d 777, 780 (1949).

■ Under the express terms of the D & O policy, notice of actual or potential claims was a condition precedent to the insurer's obligation under the contract. The policy insured against claims which the insured discovered and reported to the insurer during the policy term; notice served to demonstrate the insured's discovery of claims. *See McCullough v. Fidelity & Deposit Co.,* 2 F.3d 110, 112 (5th Cir.1993) (notice "triggers" coverage in a claims-made policy); *FDIC v. Barham,* 995 F.2d 600, 604 n. 9 (5th Cir.1993) ("notice of a claim or potential claim defines coverage under a claims-made policy"). As such, the policy's notice provisions must be strictly construed to ensure that the insured could not, through a broadly phrased "notice of claims," unilaterally expand the insurer's risk beyond that agreed in the contract of

insurance.[7] *Barham*, 995 F.2d at 604 n. 9; *see also McCullough*, 2 F.3d at 112.

■ The FDIC asserts that defendant Marzullo's 31 March 1987 letter constituted sufficient notice of a potential claim to invoke coverage under the D & O policy. Marzullo's letter, however, did no more than recite the language of the policy's notice provision and identify the FDIC as the source of potential claims. The letter said nothing of: the types of practices alleged to constitute "wrongful acts," the agents, officers, or directors alleged to be involved in wrongdoing, or the time period during which the allegedly wrongful acts took place.

■ Failure to describe the basis of a claim in greater detail precludes coverage under the policy. *See McCullough*, 2 F.3d at 112; *Barham*, 995 F.2d at 604–05. The insured simply may not, through rote incantation of the policy terms, gain coverage under a claims-made policy for undiscovered, wrongful acts that in some sense "occurred" during the policy term. The court concludes that Marzullo's letter was insufficient notice of claims to invoke coverage under the D & O policy.[8]

### B.

The FDIC next contends that the insureds' failure to comply with the contractual notice

provision does not preempt the FDIC's assertion of claims against F & D. The FDIC asserts that it stands in the shoes of an injured party (the bank) under the Louisiana Direct Action Statute and can therefore proceed directly against the insureds' liability insurance carrier, despite the insureds' failure to comply with the policy's notice provisions. *See* La.Rev.Stat.Ann. § 22:655 (West Supp.1993) (Direct Action Statute).

■ The Direct Action Statute embodies the notion that liability insurance in Louisiana is issued for the protection of the public as well as the insured. *Quinlan v. Liberty Bank & Trust Co.*, 575 So.2d 336, 339 (La. 1990). The Statute applies to every contract of liability insurance issued or delivered within the State [9] and grants injured parties a separate and distinct cause of action against an injuring party's insurer. *Davies v. Consolidated Underwriters*, 6 So.2d 351, 357 (La. 1942); *Quinlan*, 575 So.2d at 352–53. This right of action arises at the time of injury, and once vested, cannot be limited by restrictive policy language. *Holtzclaw v. Falco, Inc.*, 355 So.2d 1279, 1282 (La.1977); *see also Lumbermen's Mut. Casualty Co. v. Elbert*, 348 U.S. 48, 51, 75 S.Ct. 151, 154, 99 L.Ed. 59 (1954) (Under the Louisiana Direct Action Statute, "the insurer is severely restricted in advancing technical defenses based upon the terms of policy.").[10]

---

7. A claims-made policy limits the insurer's risk by enabling it to "close its books on a policy" soon after the policy term expires; the result is greater predictability for the insurer and lower cost to the insured. *Burns v. International Ins. Co.*, 709 F.Supp. 187, 191 (N.D.Cal.1989).

8. The FDIC also contends that because the one-year extension of the D & O policy contained significant, additional endorsements and exclusions of coverage not contained in the initial policy, it did not constitute a "renewal" of that policy. Thus, the FDIC contends that the bank has 10 days from the date F & D issues formal notice of "non-renewal" (which it contends has not yet occurred) to exercise the discovery option under the initial policy. The court concludes that to the extent the one-year extension was not a "renewal" of the initial policy, the bank received adequate notice—at the time the extension was granted—and should not now be permitted to exercise the initial policy's discovery option. *See FDIC v. Mijalis*, 800 F.Supp. 397, 405 (W.D.La.1992); *but see Continental Casualty Co. v. Allen*, 710 F.Supp. 1088, 1094 (N.D.Tex.1989).

9. As an initial matter, the court notes the D & O policy is a contract of liability insurance subject to the provisions of the Louisiana Direct Action Statute. *See First Nat'l Bank v. Lustig*, 975 F.2d 1165, 1167 (5th Cir.1992); *Quinlan v. Liberty Bank & Trust Co.*, 575 So.2d 336, 353 (La.1990) ("[U]nder a liability policy a cause of action accrues when liability attaches, whereas under an indemnification policy there is no cause of action until the liability has been discharged, as by payment of the judgment by the insured.").

10. In *Lumbermen's*, the Supreme Court distinguished between actions brought by an injured party "against the insurer alone" and actions brought against the tortfeasor "together with the insurer." 348 U.S. at 351. Under its reading of Louisiana law, the Court found that in the latter actions, insurance coverage was defined by the policy terms, in the former actions, however, the insurer was restricted in its reliance on the policy terms. The insurer could not rely on "technical defenses based upon the terms of the policy, such as a failure of notice." *Id.*

In the case of the typical, "occurrence" liability insurance policy,[11] this means that the insurer cannot—absent a showing of prejudice—raise the insured's failure to give notice of accident or injury as a defense to the insurer's direct liability to the injured party. *Auster Oil & Gas, Inc. v. Stream,* 891 F.2d 570, 577 (5th Cir.1990); *MGIC Indem. Corp. v. Central Bank,* 838 F.2d 1382, 1387 (5th Cir.1988). In a claims-made policy, however, the exact peril insured against is the insured's discovery and notice of claims. *Livingston Parish Sch. Bd. v. Fireman's Fund Am. Ins. Co.,* 282 So.2d 478, 481 (La. 1973). Notice to the insurer, under such a policy, is not merely a "technical defense" to an injured party's claims, it defines the insurer's obligation, and thus the injured party's rights, under the law. *See Barham,* 995 F.2d at 604 n. 9; *see also Livingston Parish,* 282 So.2d at 481–82; *Pareti,* 536 So.2d at 420.

The Direct Action Statute states that actions brought under its terms are subject to "all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this state." La.Rev.Stat.Ann. § 22:655(C). Insurance policies which limit coverage to claims made and reported to the insurer during the policy term are fully enforceable under Louisiana law. *Livingston Parish,* 282 So.2d at 481.

Equitable considerations that may limit an insurer's reliance on contractual "fine print" do not hold sway in a case involving sophisticated consumers, fully informed of policy limitations. *MGIC,* 838 F.2d at 1387; *see also FDIC v. Barham,* 794 F.Supp. 187, 193 (W.D.La.1991), *aff'd on other grounds,* 995 F.2d 600 (5th Cir.1993).

An insured's failure to give adequate notice of claims under a claims-made policy therefore precludes the injured party's right of direct action. *See Bank of Louisiana v. Mmahat, Duffy, Opotowsky & Walker,* 608 So.2d 218 (La.App.1992), *cert. denied,* 613 So.2d 994 (La.1993); *Barham,* 794 F.Supp. at 193, *aff'd on other grounds,* 995 F.2d 600 (5th Cir.1993); *see also MGIC,* 838 F.2d at 1387 ("Louisiana cases involving 'condition precedent' or similar language [ ] support the proposition that no recovery can be claimed where timely notice has not been given."); *cf. FDIC v. Mijalis,* 800 F.Supp. 397 (W.D.La.1992). The court thus concludes that the bank's and the directors and officers' failure to comply with the D & O policy's notice provisions precludes the FDIC's right of action against F & D in this case.[12]

### III.

Accordingly, the court GRANTS defendant F & D's motion for summary judgment, DENIES plaintiff FDIC's cross-motion for sum-

---

The Louisiana Supreme Court has since made it clear that no such distinction exists and an insurer may not rely on "technical defenses" in any direct action—regardless of whether the injured party sues the insurer alone, or in conjunction with the tortfeasor. *See Holtzclaw v. Falco, Inc.,* 355 So.2d 1279 (La.1978).

**11.** An "occurrence" policy is the most commonly used in Louisiana; under such a policy, liability is triggered when injury or damage occurs during the policy period. *See FDIC v. Barham,* 794 F.Supp. 187, 193 n. 10 (W.D.La.1991) (citation omitted), *aff'd* 995 F.2d 600 (5th Cir.1993).

**12.** F & D argued, alternatively, that the FDIC did not represent an "injured party" entitled to sue F & D under the Direct Action Statute. F & D argued the FDIC represented an insured party under the contract of insurance, and thus must fully comply with the contractual notice provisions. *See Resolution Trust Corp. v. Miramon,* No. 92–2672, slip op. at 6–8, 1993 WL 292833 (E.D.La. July 27, 1993) (finding that the RTC

represented an insured party—not an innocent, injured party under the Direct Action Statute— and therefore must comply with the express terms of the contract); *see also Fidelity & Deposit Co. v. Conner,* 973 F.2d 1236, 1241 (5th Cir.1992) (finding that FDIC claims were asserted as subrogee of the bank and were not the exercise of shareholder/depositor derivative rights); *cf. FDIC v. Mijalis,* 800 F.Supp. at 400 n. 2, 402 (finding that the FDIC represented "the failed bank's shareholders, itself as a creditor, and all previous creditors of [the bank]," and therefore could proceed against the insurer under the Louisiana Direct Action Statute despite the insured's failure to comply with the contractual notice provisions). Because the court concluded that the insureds' failure to comply with the contractual notice provision was not excused under the Louisiana Direct Action Statute, it did not reach this issue but notes the persuasiveness of F & D's argument.

mary judgment, and DISMISSES F & D as a party defendant.